Robert Franklin GODFREY,
Petitioner-Appellee,
Cross-Appellant,

v.

Ralph KEMP, Warden, Georgia Diagnostic & Classification Center,
Respondent-Appellant, Cross-Appellee.

No. 85–8570.

United States Court of Appeals,
Eleventh Circuit.

Jan. 20, 1988.
Rehearing and Rehearing En Banc
Denied March 1, 1988.

Mary Beth Westmoreland, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellant, cross-appellee.

Ellen Kreitzberg and Gerald I. Fisher, Washington, D.C., for petitioner-appellee, cross-appellant.

Before HATCHETT and ANDERSON, Circuit Judges, and GODBOLD, Senior Circuit Judge.

GODBOLD, Senior Circuit Judge:

Godfrey, a Georgia prisoner under death sentence, filed a federal habeas corpus petition in the Northern District of Georgia alleging 19 grounds for relief. The district court granted the writ on three grounds. The court held that (1) Godfrey's conviction was unconstitutionally obtained because a jury instruction shifted to him the burden of proof on the issue of intent; (2) the state would violate the double jeopardy clause if it retries Godfrey and seeks to reimpose the death penalty; and (3) the state would violate Godfrey's right to counsel if at another trial it sought to introduce testimony of a state psychiatrist who examined Godfrey after he asserted an insanity defense. The state appeals from the judgment in favor of Godfrey, and Godfrey by cross-appeal contends the denial of relief on other grounds was error.

It is undisputed that Godfrey killed his wife and his mother-in-law. The Georgia Supreme Court summarized the events surrounding these murders:

> On September 5, 1977, appellant's wife left him after he cut some of her clothes off her body with a knife. She moved in with her mother, refused to move back home, and filed for divorce. She also charged him with aggravated assault.
>
> On the morning of September 20, 1977 Appellant, who was employed as a male nurse, told a female nurse that he was getting a divorce and it would all be over on the twenty-first. (The divorce hearing was set for the twenty-second.) On the same day, Appellant's mother-in-law called him at work and told him that Mrs. Godfrey would telephone him that evening. She did call, but would not agree to halt the divorce proceedings for an attempted reconciliation. Mrs. Godfrey called back later and again refused to attempt reconciliation.
>
> Appellant took his single action rifle-shotgun and walked to the mother-in-law's trailer home, in which Mrs. Godfrey, her daughter, and her mother were playing a game around a table. Appellant killed his wife by shooting her in the head, firing through a window. He struck his eleven-year-old daughter on the head with the barrel of the gun as she ran for help. Appellant then shot his mother-in-law, killing her. He then called the Polk County Sheriff's office, identified himself, reported the crimes and gave directions to the trailer. He waited at the scene until a policeman arrived. Appellant told the policeman "they're dead. I killed them," and directed the policeman to the murder weapon which was resting in the branches of an apple tree.
>
> After being arrested and advised of his rights, Appellant was taken to the police station where he told a police officer that he had committed a "hideous crime" which he had thought about for eight years and would do again.

*Godfrey v. State,* 243 Ga. 302, 253 S.E.2d 710, 713–14 (1979).

At trial Godfrey admitted the killings and relied on the defense of insanity. He introduced the testimony of a psychiatrist who testified that Godfrey had suffered from a "dissociative attack" at the time of the killings, which resulted in his not being

able to control his subconscious impulses. The psychiatrist also testified that Godfrey asserted that he did not remember any of the events between the phone call from Mrs. Godfrey and "waking up" in jail the following day. He had given Godfrey an injection of Sodium Amytal—a "truth serum"—but Godfrey could not remember the killings even after receiving this treatment. To counter this testimony the state produced expert witnesses who testified that it was their belief that at the time of the killings Godfrey could distinguish between right and wrong.

The jury found Godfrey guilty on two counts of murder and one count of aggravated assault. The jury sentenced him to death. The Georgia Supreme Court affirmed the conviction and sentence. 253 S.E.2d 710 (1979). The U.S. Supreme Court reversed the death sentence. *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). The Georgia trial court again sentenced Godfrey to death, and the Georgia Supreme Court again affirmed. *Godfrey v. State*, 248 Ga. 616, 284 S.E.2d 422 (1981). The U.S. Supreme Court declined to consider Godfrey's case again. *Godfrey v. Georgia*, 456 U.S. 919, 102 S.Ct. 1778, 72 L.Ed.2d 180 (1982). Godfrey then filed a habeas corpus petition in the state trial court, which, after a hearing, denied relief. The Georgia Supreme Court affirmed, *Godfrey v. Francis*, 251 Ga. 652, 308 S.E.2d 806 (1983), and the U.S. Supreme Court again declined review, *Godfrey v. Francis*, 466 U.S. 945, 104 S.Ct. 1930, 80 L.Ed.2d 475 (1984). Godfrey then filed the present federal habeas petition.

The district court granted the writ. *Godfrey v. Francis*, 613 F.Supp. 747 (N.D. Ga.1985). The court ruled that the jury charge improperly shifted to Godfrey the burden of proof on the issue of intent in violation of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) and that this error was not harmless beyond a reasonable doubt. It ruled that, if the state retries Godfrey, the double jeopardy clause and the Fourteenth Amendment bar reimposition of the death sentence. It also held that the conviction and sentence must be vacated on Sixth Amendment grounds. The court concluded that statements made by Godfrey to a state psychiatrist and introduced at his trial were taken in violation of Godfrey's right to counsel because the state had conducted the examination before Godfrey was able to consult with his attorney. The state raises all of these issues on appeal.

The district court denied several grounds for relief asserted by Godfrey, and he raises these issues by cross-appeal. He asserts that both the grand jury and the traverse jury were constitutionally infirm under the Fifth, Sixth, and Fourteenth Amendments because the procedures used in selecting them discriminated on the basis of sex and race; that he was denied a trial by an impartial jury because the trial judge failed to dismiss for cause jurors who were biased in favor of imposing the death penalty; that the judge dismissed some jurors for cause even though sufficient cause had not been shown; that because the Georgia Supreme Court failed to conduct a meaningful proportionality review the imposition of the death sentence was arbitrary and capricious; that involuntary statements were improperly admitted; and that exclusion of jurors who unalterably opposed the death penalty at the guilt/innocence stage violated his right to an impartial jury.

We affirm the holdings of the district court on the *Sandstrom* issue and on the double jeopardy issue. We reverse the district court on the right to counsel issue concerning the statements made by Godfrey to the psychiatrist. The consequences are that the writ must be granted because Godfrey's conviction was unconstitutional; that, if the state retries Godfrey, any effort to re-impose the death penalty would violate the double jeopardy clause; and that the state may constitutionally introduce the psychiatrist's testimony at a new trial. Some of the issues raised by Godfrey's cross-appeal are mooted by our decision on the foregoing issues; the others we reject.

I. *Sandstrom* Issue

The district court held that the jury charge violated Godfrey's constitutional rights under *Sandstrom v. Montana*, 442

U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), because it impermissibly shifted to him the burden of proof on the issue of his intent to commit the murders. This claim was properly before the district court because the state habeas court had rejected it on its merits. 308 S.E.2d at 810–11. It is now properly before this court.

■ Godfrey asserts, and the district court ruled, that the following language in the charge violated his constitutional right that the state must prove beyond a reasonable doubt every element of the offense charged:

> The acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but the presumption may be rebutted.... Every person is presumed to be of sound mind and discretion but the presumption may be rebutted.

Both this circuit and the Supreme Court have evaluated this language in light of the mandates of due process and have concluded that this instruction does not comport with due process because it impermissibly shifts to the defendant the burden of proof on the issue of intent. *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed. 2d 344 (1985); *Bowen v. Kemp*, 769 F.2d 672 (11th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986); *Thomas v. Kemp*, 766 F.2d 452 (11th Cir. 1985), *vacated on other grounds,* — U.S. ——, 106 S.Ct. 3325, 92 L.Ed.2d 732, *on remand,* 800 F.2d 1024 (11th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1982, 95 L.Ed.2d 822 (1987); *Davis v. Kemp,* 752 F.2d 1515 (11th Cir.) (en banc), *cert. denied,* 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706, 707 (1985). Fairly read, the charge allowed the state to prevail on the issue of intent by relying on a presumption rather than proving beyond a reasonable doubt that Godfrey had the requisite intent. An unbroken line of authority condemns this instruction as unconstitutional.

■ This does not end the inquiry, however. In *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), handed down after the district court's decision in this case, the Supreme Court held that a conviction may stand if it is shown that an erroneous *Sandstrom* instruction was harmless beyond a reasonable doubt. *Id.* 106 S.Ct. at 3105–09. The Court held that the analysis of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) applies; the inquiry is whether the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt. 106 S.Ct. at 3109. This court has identified two situations where the harmless error doctrine can be invoked with respect to *Sandstrom* violations. *Bowen v. Kemp* and *Dix v. Kemp*, 832 F.2d 546 (11th Cir.1987) (en banc) (opinion deciding both cases). First is where the erroneous instruction was applied to an element of the crime that was not at issue in the trial. *Bowen* concerned a defendant who put intent in issue by raising the defense of insanity, and even though he failed to prove insanity by a preponderance of the evidence the state was not relieved of its burden of proving intent—i.e., since intent remained an issue a *Sandstrom* error could not be harmless on the basis that the instruction related to a non-issue. Godfrey, like Bowen, pleaded and failed to prove insanity but intent remained in issue, thus harmless error cannot be applied on the ground that the instruction addressed a non-issue.

■ The second basis for invoking harmless error occurs where the evidence of defendant's guilt is overwhelming. In the present case, the district court on habeas posed the question as "whether the evidence specifically related to intent was so overwhelming as to render the error harmless." 613 F.Supp. at 753. The court held that although "the evidence in support of insanity cannot be said to be overwhelming, *considering all of the circumstances involved here and the evidence specifically presented on intent,* neither can it be said that the evidence of sanity was overwhelming." *Id.* (emphasis added). The

court thus found that the instruction was not harmless. We agree with this conclusion, but our reasons differ from those of the district court. The finding that the "evidence of *sanity* was [not] overwhelming" is not conclusive on the harmlessness of the jury instruction on *intent*. Sanity and intent are distinct issues. It is constitutionally permissible for a state to require a defendant to prove his sanity. *See Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952); *Grace v. Hopper,* 566 F.2d 507, 510 (5th Cir.) (upholding the Georgia rule on insanity), *cert. denied,* 439 U.S. 844, 99 S.Ct. 139, 58 L.Ed.2d 144 (1978).[1] Intent, on the other hand, is an element of the crime that the state is required to prove beyond a reasonable doubt. *See Pope v. State,* 256 Ga. 195, 345 S.E.2d 831, 843 (1986) ("the state must in all events prove criminal intent beyond a reasonable doubt").

A defendant may introduce competent evidence at trial that is insufficient to prove insanity and yet potentially sufficient to raise a reasonable doubt about his ability to form the intent required for the crime. "The existence or nonexistence of legal insanity bears no necessary relationship to the existence or nonexistence of the required mental elements of the crime." *Grace v. Hopper,* 234 Ga. 669, 217 S.E.2d 267, 271 (1975) (*quoting Mullaney v. Wilbur,* 421 U.S. 684, 706, 95 S.Ct. 1881, 1893, 44 L.Ed.2d 508 (1975) (Rehnquist, J., concurring), *cert. denied,* 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976). A jury could find a defendant "mentally incapable of the premeditation and deliberation required to support a first degree murder verdict or of the intent necessary to find him guilty of either first or second degree murder, and yet not have found him to have been legally insane." *Leland,* 343 U.S. at 794, 72 S.Ct. at 1005.[2] After a jury finds a defendant sane, it may conclude

that he did not possess the requisite intent. In *Bowen* we said:

> The jury's rejection of his plea does not mean it found that the defendant was totally free of mental infirmity or that his capacity to formulate a specific intent was the same as that of a normal or average person. The prosecution must still prove beyond a reasonable doubt that the defendant formed the intent necessary to convict him of murder. As the *Dix* panel noted, "a reasonable jury might have rejected the argument that [the defendant] was insane, while still finding that the state failed to prove that [the defendant] possessed the requisite intent for malice murder." *Dix,* 804 F.2d [618] at 622 (11th Cir.1986).

*Bowen,* 832 F.2d at 550. *See Dick v. Kemp,* 833 F.2d 1448 (11th Cir.1987); *Kirk v. State,* 168 Ga.App. 226, 308 S.E.2d 592, 598 (1983) ("The evidence of possible insanity put on by appellant required a charge on that defense. However, the giving of that charge did not preclude the possibility that the jury would reject that defense. The criminal intent charge had to be given in anticipation of just such a rejection."), *aff'd,* 252 Ga. 133, 311 S.E.2d 821 (1984).

In determining whether the *Sandstrom* error is harmless in this case, therefore, our focus is not on whether the evidence is overwhelming in support of sanity, i.e., the lack of "mental capacity to distinguish between right and wrong" in relation to his crime. O.C.G.A. 16–3–2. Instead we look at the evidence bearing on intent, which appears to require an awareness or understanding by the defendant that he is taking certain actions and that those actions are likely to cause death. *See Pope,* 345 S.E.2d at 843 (noting the distinction between intent and insanity: the defendant "may be capable of formulating a plan with an

---

1. This case is binding precedent under *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

2. As the trial judge instructed the jury in *Leland,* in determining whether or not the defendant acted purposely and with premeditated and deliberated malice, it is your duty to take into consideration defendant's mental

condition and all factors relating thereto, and that even though you may not find him legally insane, if, in fact, his mentality was impaired, that evidence bears upon these factors, and it is your duty to consider this evidence along with all the other evidence in the case.

343 U.S. at 795 n. 8, 72 S.Ct. at 1005 n. 8.

awareness that carrying out the plan will likely result in the death of another, and yet be incapable of understanding the difference between right and wrong") (*quoting* Comment, The Use of Illegally Obtained Evidence to Rebut the Insanity Defense: A New Exception to the Exclusionary Rule?, 74 J.Crim.L. & Criminology 391, 412 (1983)).

The *Sandstrom* error cannot be found harmless in this case. Godfrey presented to the jury competent evidence tending to show a lack of mental capacity to form criminal intent even though the jury necessarily found that he could distinguish between right and wrong. This evidence is sufficient to raise at least a reasonable doubt as to whether the *Sandstrom* error was harmless under *Rose* and *Chapman.* Godfrey introduced the testimony of a psychiatrist, Dr. Davis, who testified that Godfrey suffered from a "dissociative attack" at the time of the killings. According to the doctor's testimony, in such a condition a person "may cut off from his mind awareness of what's going on around him.... [A] person might be acting sort of automatically, that his will ... was absent or greatly reduced." Trial Transcript at 314–15. In response to a question as to whether Godfrey's acts were the product of his will, Dr. Davis responded:

> I think that these are acts that he could not have done had he been himself consciously. I think had he been in his usual state of conscious awareness this act was at the time so abhorant [sic] to him that he could not have done it.

*Id.* at 323. The doctor further testified that Godfrey was unable "to exercise conscious control over his actions." *Id.* at 333. In light of this substantial evidence tending to show Godfrey's inability to form the criminal intent required for the crime, the

*Sandstrom* error was not harmless beyond a reasonable doubt within the meaning of *Chapman.*

## II. Statements Made to the State's Psychiatrist

At Godfrey's trial the state introduced the testimony of a psychiatrist who, pursuant to an order of the trial court, had examined Godfrey at a state facility. This testimony rebutted evidence offered by Godfrey in an attempt to establish an insanity defense. Godfrey asserts that this testimony should not have been allowed because it was obtained in violation of his right to counsel under the Sixth and Fourteenth Amendments.[3] The Georgia Supreme Court on habeas review considered and rejected this claim on its merits, 308 S.E.2d at 811–12, but the district court found that the state had deprived Godfrey of his right to counsel when it examined him at the state facility before allowing his attorney to consult with him.[4] This issue is properly before us, and, though it turns out that it does not involve a constitutional error on which the writ must be granted, we address it because of the possibility that it may arise upon a retrial.

A defendant has the right to effective assistance of counsel when he is confronted with a "critical stage" of his prosecution. *Estelle v. Smith,* 451 U.S. 454, 470, 101 S.Ct. 1866, 1877, 68 L.Ed.2d 359 (1981); *Cape v. Francis,* 741 F.2d 1287, 1297 (11th Cir.1984), *cert. denied,* 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 245 (1985). In *Smith* the Supreme Court held that a defendant was entitled to consult with counsel prior to a psychiatric evaluation. There the Texas trial court *sua sponte* ordered the defendant to undergo a state-administered psychiatric evaluation to de-

---

**3.** In the district court Godfrey alleged that by allowing the psychiatrist to testify the state also abridged his Fifth Amendment right against compelled self-incrimination. The district court rejected this contention, and Godfrey has not raised it before this court.

**4.** The claim before this court only involves the opportunity to consult with an attorney before a psychiatric examination. It does not involve the opportunity to have an attorney present

during the examination itself. Our predecessor court has held that "a defendant has no constitutional right to have an attorney present during a psychiatric evaluation." *Smith v. Estelle,* 602 F.2d 694, 708 (5th Cir.1979), *aff'd,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); *see also U.S. v. Byers,* 740 F.2d 1104, 1118–19 (D.C.Cir. 1984) (no Sixth Amendment right to counsel *during* psychiatric examination).

termine his competency to stand trial. At the time of this examination defense counsel had not put in issue Smith's competency to stand trial or his sanity. The state psychiatrist concluded that Smith was competent to stand trial. Smith was then tried by a jury and convicted of murder. At the sentencing phase the prosecution introduced the testimony of the state psychiatrist to prove that Smith presented a continuing danger to society. Under Texas law a finding of future dangerousness was a critical issue in imposing the death penalty. The jury found that Smith presented a danger to society. After he was sentenced to death, Smith challenged the introduction of the psychiatrist's testimony. The Supreme Court held that the psychiatric examination was a "critical stage" in Smith's prosecution and that he had a right to consult with counsel prior to the interview. It was clear that Smith's future dangerousness was a crucial issue at the sentencing phase of his trial and that the examination would present him with difficult legal choices. The Court reasoned that "[b]ecause '[a] layman may not be aware of the precise scope, the nuances, and the boundaries of his Fifth Amendment privilege,' the assertion of that right 'often depends upon legal advice from someone who is trained and skilled in the subject matter.'" *Smith*, 451 U.S. at 471, 101 S.Ct. at 1877 (*quoting Maness v. Meyers*, 419 U.S. 449, 466, 95 S.Ct. 584, 595, 42 L.Ed.2d 574 (1975)). A defendant thus has a right to counsel prior to a psychiatric evaluation that represents a critical stage [5] of the proceedings. *See also U.S. v. Garcia*, 739 F.2d 440 (9th Cir.1984).[6]

The district court held that Godfrey was denied his right to counsel on the ground "that Godfrey was examined by the state before his attorney was even aware that the motion for Godfrey's own examination had been granted." 613 F.Supp. at 757. The record does not support the finding that Godfrey's counsel was unaware that a state examination had been ordered. On state collateral proceedings the state superior court found:

> Prior to Petitioner's first trial, Counsel filed a motion for a private psychiatric examination at government expense or, alternatively, for government transportation for a private exam at Petitioner's expense. The motion in the alternative was granted on February 14th. At that hearing, the State moved that Petitioner be examined at the State facilities as soon as the private exam was completed. The trial court indicated that the State's request would be added to the order granting Petitioner's motion or that the order would provide for Petitioner to be transported to whichever facility could examine him first in order to minimize delay.
>
> The order of February 14th granting Petitioner's motion indicated that Petitioner could be examined at Central State Hospital the following day. The sheriff

---

**5.** A psychiatric examination is not *per se* a "critical stage" in a defendant's prosecution. The focus of the examination must concern an essential issue at trial for the examination to represent a "critical stage." *See Cape v. Francis*, 741 F.2d at 1297 ("[T]he petitioner cannot point to any impact that the psychiatric examination may have had on the outcome of his trial. In the absence of even such potential prejudice, it cannot be said that the petitioner was deprived of any right at a 'critical stage' of the proceedings against him."). In the present case, the state-administered examination of Godfrey did concern an issue crucial to the trial.

**6.** In *Garcia*, on which the district court relied, the Ninth Circuit held that "the sixth amendment entitles a defendant to notice and an opportunity to consult with counsel before psychiatric examination regarding sanity...." 739

F.2d at 442. The defendant in *Garcia* had informed the court that he intended to rely on an insanity defense. The government then obtained an *ex parte* order to force Garcia to submit to a state-administered psychiatric examination. Defense counsel learned of this order only after the examination had occurred. The government used the testimony of the state psychiatrist to rebut Garcia's insanity defense. The Ninth Circuit held that examining the defendant without giving him an opportunity to consult with his attorney violated the Sixth Amendment. The court found that the psychiatric examination presented a critical stage in the proceedings against Garcia because "[a] defendant may need advice regarding what sort of questions he should expect, the need to cooperate, and the possible ramifications of his answers." *Id.*

was ordered to transport Petitioner to Central State immediately.

Counsel testified before this Court that before he could act, the State had drawn up the order and Petitioner was en route to Central State. Counsel stated that he was not notified in advance or given an opportunity to speak with Petitioner prior to his departure. If given the opportunity, Counsel would have advised his client of his rights.

Order of State Superior Court 18–19 (citations to record omitted).

The district court did not find that any of the state court factual findings were not entitled to the presumption of correctness accorded them by 28 U.S.C. 2254(d). The record supports the state court findings. It tells us that on February 9 the trial court considered Godfrey's motion that the court order a psychiatric examination by a Dr. Davis at the county's expense and that in the alternative Godfrey's counsel requested that the exam be ordered at Godfrey's expense. The court stated that it would prefer to order an examination at a state facility rather than to require the county to pay for a private exam, and defense counsel then laid aside the question of payment and sought an order for the transportation of Godfrey to Dr. Davis's office in Atlanta. The court postponed its resolution of the request and asked Godfrey's counsel to provide more information about the length of time that would be required for the examination.

On February 14 the court again took up the issue of the psychiatric examination. Defense counsel again argued that Godfrey should have a private examination at county expense rather than at a state hospital. Following a dialogue on this subject, defense counsel waived the request that the county pay for Dr. Davis's examination and simply sought to have Godfrey transported to Atlanta. The prosecution then moved for an examination at the state hospital as well. This colloquy followed:

[PROSECUTOR]: Well, I'll state this motion, Your Honor, that he be sent to the state facilities as soon as the examination by Dr. Davis is completed.

THE COURT: Well, you can add that to the order, or you can provided [sic] for the order that whichever facility can examine him first the sheriff can take him to one and then bring him to the other. That's so there will be no more delay than is necessary.

Thus in open court it was made clear that there was to be an examination by Dr. Davis and, as requested by the state, there was also to be an examination at the state hospital, with the sequence of the two examinations to be determined by which examination could be done first. The court filed a written order on February 14. Godfrey's counsel may not have been aware before Godfrey was examined that the written order had been entered, but from the trial judge's announcement in open court counsel knew that an examination at the request of the state was to be conducted at the state hospital.[7] This case differs from *Smith*, where the court ordered an examination *sua sponte* without counsel's knowledge and from *Garcia*, where an *ex parte* motion for examination was granted without counsel's knowledge. *See Buchanan v. Kentucky*, —— U.S. ——, 107 S.Ct. 2906, 2918–19, 97 L.Ed.2d 336 (1987) (defendant's right to counsel was not denied when his counsel requested evaluation of his need for treatment for mental illness prior to trial); *Magwood v. Smith*, 791 F.2d 1438 (11th Cir.1986) (defendant's right to counsel was not denied when his counsel requested evaluation of his competency to stand trial and had ample opportunity to advise client).

We hold, therefore, that the district court erred in holding that the introduction of this testimony violated Godfrey's Sixth Amendment rights.

### III. Double Jeopardy

In granting the writ the district court forbade the state, if it again convicts Godfrey, from seeking to reimpose the death penalty. It found that when the state

---

7. Although the record does not reveal when Godfrey was taken away for the examination, it does indicate that he was admitted at the state hospital on February 15.

forced Godfrey to place his life in jeopardy by submitting to a second death sentence proceeding it violated his rights under the double jeopardy clause and the Fourteenth Amendment. Accordingly, it found that any future attempt to sentence Godfrey to death would suffer from the same constitutional defect. This claim was properly before the district court because it had been presented to, and rejected by, the state court. 284 S.E.2d at 424–25. Thus, it is properly before this court.

Resolution of this claim necessitates a review of the state's efforts to sentence Godfrey to death. After the jury convicted him on two counts of murder, the trial court proceeded to the sentencing phase of Georgia's death penalty scheme. The only statutory aggravating circumstance that the state argued to the jury was Ga.Code 27–2534.1(b)(7) (1978), which allows the jury to impose a death sentence if it finds beyond a reasonable doubt that the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." The jury returned a finding that the murders in this case were "outrageously or wantonly vile, horrible and inhuman" and imposed sentences of death for both murder convictions. The Georgia Supreme Court affirmed these sentences. 253 S.E.2d 710. The U.S. Supreme Court reversed both death sentences on the ground that the application of the aggravating circumstance was unconstitutional. The case was remanded to the Georgia Supreme Court, which remanded to the trial court.

Before the trial court the state again sought the death penalty. In this second sentencing trial the state relied on an aggravating circumstance that it had not presented to the first sentencing jury, i.e., that the jury had the discretion to impose the death sentence because the murders had been committed while the offender was engaged in the commission of another capi-

tal felony. Ga.Code 27–2534.1(b)(2) (1978). The sentencing jury imposed the death sentence on both murder convictions based on a finding that the (b)(2) aggravating circumstance was present. The Georgia Supreme Court rejected Godfrey's contention that this second imposition of the death sentence violated his rights under the double jeopardy clause and the Fourteenth Amendment. The court, however, reduced one of the death sentences to life imprisonment. Mrs. Godfrey's murder had provided the aggravating circumstance for the death sentence for her mother's murder, and the mother's murder had provided the aggravating circumstance for the death sentence for Mrs. Godfrey's murder. Because Georgia law forbids the use of such "mutually supporting" aggravating circumstances, the Georgia Supreme Court reduced the sentence for Mrs. Godfrey's murder to life.

The federal district court, because it had determined that Godfrey's conviction was constitutionally invalid, held that the remaining death sentence predicated on this conviction was also invalid. The court also held that if the state retried Godfrey the double jeopardy clause forbade it from seeking the death penalty. It based its holding on its reading of the Supreme Court's reversal of Godfrey's first death sentence. It read the Court as having held that the evidence presented at trial was insufficient to support Godfrey's death sentence under the (b)(7) aggravating circumstance. When the district court reached its decision it was settled law in this circuit that if a death sentence is set aside because the evidence offered was legally insufficient to support imposition of the death penalty, the state may not seek to resentence the defendant to death even if it relies on grounds not presented to the first sentencing jury. *Young v. Kemp*, 760 F.2d 1097 (11th Cir.1985), *cert. denied*, 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986).[8]

---

8. The state suggests that the Supreme Court has called into question the application of *Young* to the present case. It points to footnote 15 of the Supreme Court's *Godfrey* opinion which states: "The sentences of death in this case rested exclu-

sively on (b)(7). Accordingly, we intimate no view as to whether or not the petitioner might constitutionally have received the same sentences on some other basis." 446 U.S. at 432 n. 15, 100 S.Ct. at 1767 n. 15. From this passage

Before determining whether the district court correctly decided that the Supreme Court's decision to vacate Godfrey's initial death sentence was based on sufficiency of the evidence, we must first reexamine our decision in *Young* in light of the Supreme Court's subsequent decision in *Poland v. Arizona*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986).

In *Poland* the defendants were convicted of capital murder. At their sentencing hearing the state sought to prove two aggravating factors: that the murders were done for pecuniary gain and that they were committed in "an especially heinous, cruel, or depraved manner." *Id.* 106 S.Ct. at 1751. The trial judge, who sits as sentencer under the Arizona death penalty scheme, found that the first factor was not meant to apply to the type of murder before him but that the second factor was present. He sentenced both defendants to death. The Arizona Supreme Court reversed. It held that defendants were entitled to a new trial based on errors in their first trial. It also found that there was insufficient evidence to support the presence of the second aggravating factor. It remanded the case to the trial court, noting that if the defendants were reconvicted the state could again seek capital punishment. *Id.*

On remand the defendants were again convicted of capital murder. At the second sentencing hearing the state alleged the same aggravating factors as in the first sentencing hearing.[9] The trial judge sentenced defendants to death after finding that both factors were present. The Arizona Supreme Court again struck down the finding of the second factor on the ground that the evidence offered to support it was legally insufficient. It affirmed the death

sentences based on the first factor. *Id.* at 1752–53. On certiorari from the Arizona Supreme Court the U.S. Supreme Court held that the second imposition of the death penalty did not violate the double jeopardy clause.

The Court began its analysis in *Poland* with a review of its two previous decisions applying the double jeopardy clause to the sentencing stage of a capital proceeding. In *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), the Court had held that a defendant who was sentenced to life imprisonment after his first trial and succeeded in having his conviction overturned on appeal could not be sentenced to death after being convicted at his second trial. In *Arizona v. Rumsey*, 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984), the Court applied these principles to the Arizona sentencing scheme. In *Poland* the Court concluded that under these two prior cases "the relevant inquiry ... is whether the sentencing judge or the reviewing court has 'decid[ed] that the prosecution has not proved its case' for the death penalty and hence has 'acquitted' [the defendants]." 106 S.Ct. at 1754 (quoting *Bullington*, 451 U.S. at 443, 101 S.Ct. at 1860).

Undertaking this inquiry in *Poland*, the Court found that there had not been an acquittal because no court had found that the prosecution had failed to prove its case. The Arizona Supreme Court had held that the only aggravating factor found by the trial court after the first sentencing was not supported by substantial evidence. This was offset, however, by a finding that the sentencing judge had made an erroneous interpretation on the other aggravating

the state argues that the Court has authorized resentencing Godfrey to death based on a different aggravating circumstance. The state attempts to read too much into this footnote. It is apparent from its face that the footnote refers to what the trial court might have done at the first sentencing hearing. No language in either this footnote or the body of the opinion indicates that the Court had in mind a second sentencing hearing.

**9.** A third aggravating factor was alleged as to one defendant that had not been alleged at the

first trial. The trial court found this factor present and included it as a basis for imposing the death sentence. Because the Court found that the reversal of the first death sentence was not an acquittal of the sentence of death, see text *infra*, it had no need to reach the question whether this reliance on a new aggravating factor would be permissible if a reviewing court held that the prosecution had failed to present a legally sufficient case for the death penalty. We decided this issue in *Young*, and we are satisfied that its reasoning is still sound. See text *infra*.

factor argued before him and that on re-trial the court might properly find the ex-istence of this second factor. 106 S.Ct. at 1754–56. Thus neither the sentencing court nor the Arizona Supreme Court had held that the evidence presented at the first sentencing hearing was insufficient to support the death penalty on *any* ground presented at the first trial. Accordingly, defendants had never been "acquitted" of the death penalty, and the prosecution was not barred from again seeking to impose the ultimate penalty.

The Court's analysis in *Poland* leads us to reaffirm our decision in *Young*. In *Young* we held that where the prosecution offers legally insufficient evidence in sup-port of the only aggravating factors it has chosen to argue, it cannot later attempt to impose the death sentence based on these or additional aggravating factors. We be-gan our analysis with the proposition that if the initial sentencer imposes a life sen-tence the defendant is "acquitted" of death and the state may not seek the death penal-ty a second time. 760 F.2d at 1106. *Po-land*'s analysis begins with the same prop-osition. *See* 106 S.Ct. at 1753. Our next step was to note that an appellate court's finding that the proffered evidence was legally insufficient must be treated as an acquittal. *See Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). The Supreme Court in *Poland* reaffirmed this principle. 106 S.Ct. at 1753 n. 2. Put-ting these two principles together we con-cluded that once a court determines that a defendant is "acquitted" in a sentencing hearing, the state is precluded from seek-ing to reimpose the death sentence on any grounds. 760 F.2d at 1107 n. 12.

The difference between *Poland* and *Young* lies in the application of the second principle relied on in *Young* to the facts before the court. The defendant in *Young* had had a court determination that the prosecution's case for death was legally insufficient; the defendant in *Poland* had not. In *Young* we were not faced with the issue decided in *Poland*, and nothing in our reasoning conflicts with the Supreme Court's later ruling.

■ This case is controlled by *Young*. The state at Godfrey's initial sentencing hearing argued only one aggravating factor. If the U.S. Supreme Court's rever-sal of Godfrey's conviction was based on the ground that the evidence presented by the state was legally insufficient to support a finding that this aggravating factor was present, then the state, by failing to prove the only theory it presented, had failed at Godfrey's initial sentencing hearing to prove that death was an appropriate pun-ishment, and the double jeopardy clause bars Georgia from attempting to resen-tence Godfrey to death.

■ The state contends, and the Georgia Supreme Court agreed, that the Supreme Court based its reversal of Godfrey's first death sentence on the ground that the Georgia Supreme Court applied an uncon-stitutional construction of its (b)(7) aggra-vating factor and thus did not rule on the sufficiency of the evidence. But since the Georgia Supreme Court's decision, this court has twice decided, in *Stanley v. Zant*, 697 F.2d 955, 971 (11th Cir.1983), *cert. de-nied*, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984) and in *Johnson v. Kemp*, 759 F.2d 1503, 1509 (11th Cir.1985), that the *Godfrey* decision in the United States Supreme Court turned on sufficien-cy of the evidence. In both cases this court held that the Supreme Court's decision in *Godfrey* turned on whether the evidence could support a finding of the (b)(7) aggra-vating factor under any construction of the factor that was not unconstitutionally vague.

In *Stanley* we noted that "[t]he inquiry in *Godfrey* focused on whether the evi-dence in that case satisfied the criteria previously established by the Georgia Su-preme Court for application of section (b)(7).... [The Court] concluded that the Georgia Supreme Court had misapplied its own constitutional construction because the evidence that it found sufficient did not reveal a consciousness materially more de-praved than that of any other murderer." Similarly in *Johnson* we observed that "[t]he Court found that the facts of *God-frey* ... did not satisfy Georgia Supreme

Court decisions narrowing the scope of (b)(7)." These decisions establish that the Supreme Court held that the evidence presented at Godfrey's first sentencing trial was insufficient to support a death sentence under the only aggravating circumstance that was presented to the jury. Our independent review of *Godfrey* leads us to the same conclusion. Under *Young* this finding bars any subsequent attempt to impose the death penalty on Godfrey for the murders in this case.

### IV. The Grand Jury Challenge

Godfrey asserts that his indictment was unconstitutionally obtained because the grand jury that indicted him was not selected in accordance with the Sixth and Fourteenth Amendments.[10] Specifically, he contends that the procedures used for selecting grand juries in Polk County in 1976 discriminated against blacks and women. The state trial court refused to consider the merits of this challenge because Godfrey had not filed a timely objection. The Georgia Supreme Court on two occasions affirmed this ruling and refused to consider the merits of Godfrey's claim. 253 S.E.2d at 714–15; 308 S.E.2d at 809–10. The district court, however, declined to rest its decision on the waiver issue and instead ruled that Godfrey's claim failed on the merits. 613 F.Supp. at 758.

 A state decision that rests on a uniformly applied independent and adequate state procedural rule requiring a criminal defendant to file a timely objection to an alleged defect will generally bar a federal habeas court from reviewing the alleged defect. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976); *Spencer v. Kemp*, 781 F.2d 1458 (11th Cir. 1986) (en banc). The defendant can overcome this procedural bar either by showing

cause and prejudice, *Francis, supra*, or by showing that the state violated his due process rights by denying him the opportunity to file a timely objection, *Reece v. Georgia*, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955); *Tennon v. Ricketts*, 574 F.2d 1243 (5th Cir.1978), *cert. denied*, 439 U.S. 1091, 99 S.Ct. 874, 59 L.Ed.2d 57 (1979). At the time of Godfrey's trial Georgia law required challenges to the composition of a grand jury to be made before the indictment is returned. The defendant is excused from this requirement if he shows that he had no knowledge, either actual or constructive, of the illegal composition of the grand jury when the indictment was returned.[11] *See Sanders v. State*, 235 Ga. 425, 219 S.E.2d 768 (1975), *cert. denied*, 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (1976). Godfrey failed to comply with this procedural rule. He was indicted December 15, 1977, and the challenge to the grand jury was not filed until February 1, 1978. Godfrey has not alleged that he had no knowledge of the illegal composition of the grand jury when his indictment was returned. 253 S.E.2d at 715.

This procedural bar represents an independent and adequate state ground of decision. Jury discrimination claims must be raised in a timely fashion. *Francis v. Henderson, supra; Davis v. United States*, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973); *Tennon v. Ricketts, supra*. In *Tennon* the Fifth Circuit held that failure to comply with Georgia's objection-before-indictment rule barred a habeas petitioner from challenging the composition of the grand jury that indicted him where the petitioner did not show either that the state precluded him from filing a timely objection or that he met the cause and prejudice standard of *Francis*. *See also Spencer v. Kemp*, 781 F.2d at 1470 n. 22 ("In *Reece* the Supreme Court accepted the general validity of the Georgia rule requir-

---

**10.** Godfrey makes a similar attack on the composition of the traverse jury that convicted him. Because of our holding on the *Sandstrom* violation we do not address this claim.

**11.** After Godfrey's trial Georgia altered its grand jury objection rule. Now Rule 11(a)(5) of the

Georgia Unified Appeal Procedure, 246 Ga. A–1 (1980) (Code Ann. ch. 27–25 Appendix) provides that a defendant in a death penalty case may challenge the array after indictment. *See* 308 S.E.2d at 809 n. 1; *Walraven v. State*, 250 Ga. 401, 297 S.E.2d 278 (1982).

ing that challenges to the grand jury be made before indictment....”). We have no indication that the Georgia courts have failed to apply this rule uniformly. Thus, unless Godfrey can demonstrate to us that cause and prejudice existed or that the state denied him the opportunity to file a timely objection, we cannot consider the merits of his grand jury challenge.

Godfrey does not meet the prejudice prong of the cause and prejudice requirement of *Francis.* In *Francois v. Wainwright,* 741 F.2d 1275 (11th Cir.1984) the defendant had failed to file a timely grand jury challenge. We held that even if the defendant could make a showing of cause he would not be entitled to have his claim heard on the merits because he had not shown sufficient prejudice. We reasoned that “the evidence against the defendant was so overwhelming that there is no question that he would have been reindicted. Therefore, a successful grand jury challenge would have served only to delay the date of trial.” *Id.* at 1283. Similarly, in this case there is little doubt that had Godfrey’s original indictment been quashed he would have been reindicted. He was found at the scene of the killings, it was his telephone call that led the police there, and he never denied having committed the murders. Thus, as in *Francois,* the defendant’s failure to establish sufficient preju-

dice bars consideration of his grand jury challenge on the merits.[12]

The district court’s decision denying relief on the ground that Godfrey’s grand jury was unconstitutionally composed must be affirmed.

## V. Other Issues

Godfrey raises two issues that are mooted by our resolution of the *Sandstrom* and double jeopardy issues: whether the Georgia Supreme Court conducted a meaningful proportionality review and whether it was error to refuse to remove for cause from the resentencing jury one juror who was biased in favor of the death penalty.

■ Godfrey has also challenged his conviction on the ground that statements that he made to the police after his arrest and that were introduced at trial were involuntary. This issue is not properly before us because no objection was made at trial to the introduction of these statements. *See* 308 S.E.2d at 813.[13]

Godfrey also raises the issue of whether the exclusion from the guilt phase of his trial of jurors unalterably opposed to the death penalty violates the constitutional guarantee of a representative jury. The Supreme Court recently rejected a similar challenge to “death-qualified” juries.

---

12. This holding is not inconsistent with the Supreme Court’s recent decision in *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986). There the Supreme Court held that once a prisoner demonstrates that he was indicted by an unconstitutionally composed grand jury he is entitled to have his conviction reversed automatically. The Court acknowledged that this decision was merely an affirmation of its decision six years earlier in *Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). 106 S.Ct. at 624. *Mitchell* was on the books when we decided *Francois.* In *Francois* we rejected the argument that *Mitchell's* automatic reversal rule satisfied the prejudice requirement of *Francis.* We reasoned that because *Mitchell* expressly distinguished itself from *Francis* on the ground that the petitioners in *Mitchell* did not procedurally default on their grand jury claims, the decision in *Mitchell* did not call into question *Francis's* requirement of a showing of actual prejudice. Because the petitioners in *Vasquez* also did not procedurally default on their claim, we see nothing in that

opinion that suggests it has altered our reasoning in *Francois.* Thus, *Francois* is still the law of this circuit.

13. Although the district court found it unnecessary to rule on this issue because of its holding on the *Sandstrom* issue, it noted that the state had not conducted a *Jackson v. Denno* hearing before trial to determine the voluntariness of Godfrey’s statements. *See Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). It then suggested that if the state chose to retry Godfrey it should conduct such a hearing. 613 F.Supp. at 763.

 The state interpreted this passage as *requiring* it to hold such a hearing before any retrial. We read the district court’s opinion only as a *suggestion* to the state so as to lessen the possibility that the voluntariness of these statements might again come before a district court on habeas review if Godfrey is reconvicted. The district court’s explicit refusal to consider the merits of Godfrey’s claim confirms this reading of its opinion.

*Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).[14]

### Conclusion

All the issues raised by the cross-appeal are either mooted or no error occurred with respect to them. On the appeal, based upon our conclusion on the *Sandstrom* issue, part I of our opinion, and our conclusion on the double jeopardy issue, part III of our opinion, the judgment of the district court granting the writ and holding that the state may not seek the death penalty at any retrial of the petitioner is AFFIRMED.

---

14. The following issues that were presented to the district court have not been raised in this appeal: ineffective assistance of counsel; denial of fair trial at guilt/innocence phase; denial of fair trial at resentencing; failure to determine Godfrey's indigency status; that his death sentence is arbitrary and capricious because such sentences are rarely given in cases of domestic murders; that his death sentence was the product of racial discrimination; that the state habeas court failed to provide funds to pursue his claims; that the trial court erred in denying his motion for change of venue; that electrocution is a cruel and unusual punishment; that the trial judge improperly instructed the sentencing jury on mitigating circumstances; and that O.C. G.A. 17–10–30(b)(2) was applied in an overly broad fashion.