## S97R1412. GIBSON v. TURPIN.
(513 SE2d 186)

HINES, Justice.

Exzavious Lee Gibson was convicted of armed robbery and malice murder in 1990, and was sentenced to death. This Court affirmed the judgments of conviction and sentences entered thereon on direct appeal, *Gibson v. State*, 261 Ga. 313 (404 SE2d 781) (1991), and the United States Supreme Court denied certiorari. *Gibson v. Georgia*, 502 U. S. 1101 (112 SC 1188, 117 LE2d 430) (1992). On December 20, 1995, Gibson filed a petition for writ of habeas corpus asserting ineffective assistance of counsel, prosecutorial misconduct, and other claims. The habeas corpus court denied Gibson's request for relief on March 11, 1997, and he filed an application for certificate of probable cause to appeal with this Court. Because there is no state or federal constitutional right to an appointed lawyer upon habeas corpus and because Gibson's remaining claims are without merit, we deny Gibson's application for certificate of probable cause to appeal.

The evidence supporting Gibson's convictions and death sentence is detailed in *Gibson*, 261 Ga. at 313-314 (1). Gibson entered a grocery store and killed the owner with a knife by stabbing and slashing him 39 times. He attacked with such force that the blade of the knife broke in the victim's neck vertebrae, and still he continued stabbing with the handle and blade remnant. Acting on information provided by a witness, the police arrested Gibson at his house. Bloody money, bloody clothes and the victim's wallet were found in Gibson's bedroom. Gibson confessed that he robbed and murdered

the victim because he needed money for drugs, and because he had been in the store earlier on the day of the crimes and the victim had chastised him for using profanity. Gibson also told the police that he had no regrets about what he had done.

1. Gibson claims that he was denied his constitutional rights because he did not have state-funded counsel to represent him during his habeas corpus proceedings. Gibson's direct appeals were exhausted in 1992, when the United States Supreme Court denied his petition for certiorari and motion for rehearing. With the assistance of the Georgia Appellate and Educational Resource Center ("Resource Center"),[1] Gibson filed his petition for writ of habeas corpus on December 20, 1995. He was not facing a scheduled execution date when the petition was filed. Gibson and the Resource Center, who appeared as amicus curiae throughout his case, repeatedly moved for a continuance of the evidentiary hearing because the Resource Center had not located volunteer counsel to represent him.[2] The Resource Center also repeatedly claimed that it lacked the staff to directly represent him. The motions for a continuance were denied.

At the habeas corpus evidentiary hearing in September 1996, a lawyer with the Resource Center, Elizabeth Wells, appeared as amicus curiae to protest the case going forward. The habeas court invited Ms. Wells to represent Gibson, but she refused. Ms. Wells stated that the Resource Center would represent Gibson as counsel of record, but only if the habeas court would reschedule the case so as to allow her time to review the record. The habeas court declined granting a continuance based on this conditional offer. After the evidentiary hearing, the habeas court issued a final order denying Gibson relief from his convictions and sentences. Gibson maintains that his constitutional rights were violated because the State of Georgia did not pro-

---

[1] The Resource Center was created in 1988 through the joint efforts of this Court, the State Bar of Georgia, the Georgia Attorney General, and the federal judiciary to provide expert assistance to attorneys who volunteer to represent indigent, death-row inmates in post-conviction proceedings. The Resource Center obtains volunteer counsel for death-sentenced inmates, and sometimes directly represents prisoners through its staff attorneys.

[2] In addition to assisting Gibson with the preparation and filing of his habeas corpus petition, the Resource Center filed the following motions in his case: Amicus Curiae Motion for Reconsideration of Scheduling Order (February 19, 1996), Amicus Curiae Motion for Reconsideration of Scheduling Order (March 25, 1996), Amicus Curiae Motion to Reconsider Scheduling Order (May 10, 1996), Amicus Curiae Motion for Hearing on Amicus Curiae Motion to Reconsider Scheduling Order (May 17, 1996), Amicus Curiae Motion for Ruling on Previously Filed Motions (August 16, 1996), Additional Amicus Curiae Motion to Reconsider Scheduling Order (August 16, 1996), Amicus Curiae Motion for Hearing on Additional Amicus Curiae Motion to Reconsider Scheduling Order (August 16, 1996), and Amicus Curiae Motion for Reconsideration of Final Order (March 20, 1997). The Resource Center also assisted Gibson in the preparation and filing of his Motion to Adopt Motions Filed by Amici Curiae.

vide him with a state-funded attorney for his habeas corpus proceedings. We disagree.

It is well settled that there is no federal or state constitutional right to appointed counsel in Georgia habeas corpus proceedings. *Coleman v. Thompson*, 501 U. S. 722, 755-758 (111 SC 2546, 115 LE2d 640) (1991) (capital case); *Murray v. Giarratano*, 492 U. S. 1, 11-12 (109 SC 2765, 106 LE2d 1) (1989) (capital case); *Pennsylvania v. Finley*, 481 U. S. 551, 555 (107 SC 1990, 95 LE2d 539) (1987); *State v. Davis*, 246 Ga. 200, 201-202 (269 SE2d 461) (1980) (capital case); *Stephens v. Balkcom*, 245 Ga. 492, 492-493 (3) (265 SE2d 596) (1980). Under the United States Constitution, the state is required to provide counsel to indigent defendants for their trial, *Gideon v. Wainwright*, 372 U. S. 335 (83 SC 792, 9 LE2d 799) (1963), and for their first appeal as a matter of right, *Douglas v. California*, 372 U. S. 353 (83 SC 814, 9 LE2d 811) (1963), but no further. The Constitution does not even require states with multi-tiered appellate systems to appoint appellate counsel through the exhaustion of an indigent defendant's discretionary direct appeals. *Ross v. Moffitt*, 417 U. S. 600 (94 SC 2437, 41 LE2d 341) (1974).

After his direct appeals are ended, a prisoner may seek a writ of habeas corpus alleging that his trial and direct appeals included substantial error under the federal or state constitutions. OCGA § 9-14-42 (a). However, habeas corpus is not a criminal proceeding, but is considered to be civil in nature. *Finley*, 481 U. S. at 557; *Nolley v. Caldwell*, 229 Ga. 441, 441 (4) (192 SE2d 151) (1972). It is a collateral attack that is separate and distinct from direct review, and occurs only after a prisoner has failed to obtain relief by direct appeal. Id. It is not an extension of direct appeal:

> Habeas corpus always has been a *collateral* remedy, providing an avenue for upsetting judgments that have otherwise become final. It is not designed as a substitute for direct review.

(Emphasis in original.) *Mackey v. United States*, 401 U. S. 667, 682-683 (91 SC 1160, 28 LE2d 404) (1971) (Harlan, J., concurring in part and dissenting in part). Habeas corpus is not intended to be a means for re-litigating a prisoner's case. See *Gunter v. Hickman*, 256 Ga. 315, 316 (1) (348 SE2d 644) (1986) (issues raised and decided on direct appeal cannot be reasserted in habeas corpus proceedings); *Black v. Hardin*, 255 Ga. 239, 240 (4) (336 SE2d 754) (1985) (failure to raise an alleged error on direct appeal will ordinarily preclude habeas corpus review). No state is obligated under the United States Constitution to provide habeas corpus proceedings as a means of obtaining post-conviction relief. *Finley*, 481 U. S. at 557. Habeas

corpus review is not a second trial.

Exzavious Lee Gibson was arrested nine years ago for murder. Because he was indigent, the trial court appointed a lawyer who was experienced in death penalty litigation to defend him at the state's expense. Gibson's lawyer investigated and tried the case. A jury of Gibson's peers, after receiving the overwhelming evidence of his guilt and the brutality of the murder, convicted him and sentenced him to death. Gibson's appointed, state-funded lawyer appealed, raising numerous enumerations of error. This Court, finding no harmful error with Gibson's trial, unanimously affirmed his convictions and sentences. *Gibson*, 261 Ga. at 317. The entire process, trial and direct appeal, was governed by the Unified Appeal Procedure ("UAP"), OCGA § 17-10-36, which utilizes a checklist to ensure that "all possible matters which could be raised in defense have been considered by the defendant and defense counsel and either asserted in a timely and correct manner or waived in accordance with applicable legal requirements." OCGA § 17-10-36 (b); UAP § I (A). An appointed lawyer represented Gibson at every stage of his criminal defense.

After his direct appeals were exhausted, Gibson exercised his right under the Georgia constitution to petition for writ of habeas corpus. However, he asserts that this is an empty right because the lack of a state-funded lawyer prevents him from adequately raising his claims. This Court has previously addressed whether the lack of appointed counsel denies an indigent death-row petitioner meaningful access to the courts under *Bounds v. Smith*, 430 U. S. 817 (97 SC 1491, 52 LE2d 72) (1977), and has held that it does not. *Davis*, 246 Ga. at 201. In *Davis*, this Court further held that there is no exception for death-row inmates based upon the irrevocability of death, reasoning that, if meaningful access to the courts meant appointed counsel, all habeas corpus petitioners would be entitled to appointed counsel. Id.

The dissent seeks to stretch the right of meaningful access to the courts beyond its constitutional bounds. Meaningful access means that state authorities must ensure that inmates have " 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " *Lewis v. Casey*, 116 SC 2174, 2180 (1996), quoting *Bounds*, 430 U. S. at 825. For example, a state may not interfere with an inmate's attempt to prepare or file legal documents, and a state must waive filing fees for indigent inmates. *Lewis*, 116 SC at 2179. Meaningful access does not mean that a state must help inmates discover grievances, or litigate effectively when in court. *Lewis*, 116 SC at 2181. It is simply the right of an inmate to raise his claims and be heard.

Gibson does not allege that Georgia did anything to prevent him from raising his claims. Instead, he asserts that Georgia should have

financed his habeas corpus litigation by providing him with a lawyer at state expense. In other words, he raised his claims, but not as effectively as he would have preferred. Gibson, however, has cited no cases that entitle him to a lawyer in order to have meaningful access to the courts. While the United States Supreme Court has provided some examples of what resources provided to inmates may constitute meaningful access to the courts upon habeas corpus, such as adequate law libraries, *Bounds*, 430 U. S. at 830, it has never held that an appointed attorney is required. Indeed, the Supreme Court has specifically disclaimed the idea that the Constitution requires the permanent provision of counsel so that inmates can litigate more effectively. *Lewis*, 116 SC at 2181.

The apparent rationale underlying Gibson's claim of lack of meaningful access to the courts is that he is not intelligent and habeas corpus law is complex ("Byzantine"). This rationale, however, does not distinguish him from the many non-capital habeas petitioners. Numerous prisoners have limited intellect and education, and many issues that arise in non-capital cases are complicated. The test for ineffective assistance of counsel outlined in *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984), and *Smith v. Francis*, 253 Ga. 782 (325 SE2d 362) (1985), and the required showings necessary to prevail on this claim, are the same for non-capital cases as capital cases. If an appointed lawyer is truly *constitutionally* required in order to ensure meaningful access to the courts upon habeas corpus, courts would be hard-pressed to justify why only death-row inmates, and not all inmates, should have this *constitutional* right. "Death is different" is the only reason that this line could be drawn.

The "death is different" reason is often used to justify additional procedures and closer scrutiny in death penalty cases. The phrase is correct: death *is* different. Death penalty cases *do* require closer examination and the additional safeguards provided by law.[3] The citi-

---

[3] For this reason, the Georgia death penalty statute is crafted to narrow the class of murderers who may receive the death penalty to the most culpable. OCGA § 17-10-30; *Gregg v. Georgia*, 428 U. S. 153, 196-197 (96 SC 2909, 49 LE2d 859) (1976). A convicted murderer can only receive a death sentence if the prosecution proves the existence of at least one statutory aggravating circumstance beyond a reasonable doubt. OCGA § 17-10-30 (c); *Gregg*, 428 U. S. at 197. In order to convince a jury that life imprisonment is the appropriate sentence, a capital defendant is permitted to introduce anything as mitigating evidence as long as it relates to his offense, background or character. *Barnes v. State*, 269 Ga. 345, 358-360 (27) (496 SE2d 674) (1998). A Georgia sentencing jury is also not instructed to weigh mitigating circumstances, and may return a life sentence for any reason or no reason at all. *Barnes*, 269 Ga. at 359 (27). If a defendant is mentally retarded, the death sentence may not be imposed in this state. OCGA § 17-7-131 (j). On appeal, this Court, in addition to reviewing for error, determines whether the death sentence is proportional to other death penalty cases when considering both the crime and the defendant, and whether the death sentence

zens of this state should be, must be, appalled at the prospect of executing an innocent person, or a murderer undeserving of the ultimate punishment. But anyone familiar with the facts that underlie this petitioner's convictions and sentences, of what he did to a shopkeeper on February 2, 1990, knows that Exzavious Lee Gibson is neither innocent nor undeserving of the death penalty. "Death is different" is a crucial reminder of the gravity of a sentence where the state seeks to punish a defendant by taking his life, and of the need for procedural safeguards in the determination and carrying out of such a sentence, but it should not be used to construct constitutional rights that do not exist, or to usurp the legislature's role in determining the structure of our criminal justice system and the allocation of legal resources. Neither the federal nor Georgia constitutions require the appointment of a lawyer for a death-row inmate to have meaningful access to the courts upon habeas corpus. *Giarratano*, 492 U. S. at 11-12; *Davis*, 246 Ga. at 201.

The lack of appointed counsel upon state habeas corpus is also not "fundamentally unfair." Obviously, an attorney could better investigate, structure, and present Gibson's habeas claims than Gibson could. But this simple fact does not support an equal protection claim:

> The duty of the State under our cases is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process.

*Finley*, 481 U. S. at 556, quoting *Ross*, 417 U. S. at 616. Nor does it support a due process claim because the existence of habeas corpus " 'does not automatically mean that a State then acts unfairly by refusing to provide counsel to indigent defendants at every stage of the way.' " *Finley*, 481 U. S. at 556, quoting *Ross*, 417 U. S. at 610-611.

Gibson further argues that he has a constitutional right to a state-funded lawyer upon habeas corpus because, as he had the same lawyer at trial and on direct appeal, it is his first opportunity to raise a Sixth Amendment claim of ineffective assistance of counsel. This argument, which the dissent asserts was left an "open question" by *Coleman*, 501 U. S. at 755-756, has since been rejected by every federal court of appeals that has considered it. *Mackall v. Angelone*, 131 F3d 442, 449, n. 13 (4th Cir. 1997); *Parkhurst v. Shillinger*, 128 F3d

---

was imposed under the influence of impermissible passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1) and (3); *Gregg*, 428 U. S. at 204-206.

1366, 1371 (10th Cir. 1997); *Hill v. Jones*, 81 F3d 1015, 1024-1026 (11th Cir. 1996); *Bonin v. Calderon*, 77 F3d 1155, 1159-1160 (9th Cir. 1996); *Nolan v. Armontrout*, 973 F2d 615, 616-617 (8th Cir. 1992). Two additional reasons for not creating this constitutional right bear consideration. First, as with meaningful access, if a constitutional right to habeas counsel exists for this reason it would apply to almost all habeas corpus petitioners, and not just to death-row inmates. Second, a constitutional right to habeas counsel, carried to its logical conclusion, would spawn more litigation and delay in an already cumbersome system. This Court and the United States Supreme Court have long held that the constitutional right to counsel is the right to effective counsel. *Strickland*, 466 U. S. at 686; *McMann v. Richardson*, 397 U. S. 759, 771, n. 14 (90 SC 1441, 25 LE2d 763) (1970); *Black v. State*, 264 Ga. 550 (1) (448 SE2d 357) (1994); *Pitts v. Glass*, 231 Ga. 638, 639 (203 SE2d 515) (1974). Presumably, if there is a constitutional right to counsel upon state habeas corpus, an additional Sixth Amendment claim will exist in Georgia: ineffective assistance of habeas counsel. See *Wainwright v. Torna*, 455 U. S. 586, 587-588 (102 SC 1300, 71 LE2d 475) (1982) (a defendant can only be deprived of his Sixth Amendment right to effective assistance of counsel where there is a constitutional right to counsel).[4] Also, if the same reasoning applies, a petitioner who raises this new claim must have appointed counsel to do so, because it is his first opportunity to raise this constitutional claim with regard to his habeas counsel. There will be collateral proceedings to consider alleged Sixth Amendment error in previous collateral proceedings. See *Bejarano*, 929 P2d at 925 (if ineffective assistance of post-conviction counsel is a viable claim then "claims of ineffective assistance of counsel in the immediate prior proceeding may be raised ad infinitum").

In determining what is constitutionally required, a relevant inquiry is also what is the contemporary practice. As part of his claim

---

[4] Jurisdictions that provide a *statutory* right to post-conviction counsel have addressed a claim of ineffective assistance of post-conviction counsel in different ways. Some reason that such a claim is not viable because there is no constitutional right to post-conviction counsel, see *House v. State*, 911 SW2d 705, 712 (Tenn. 1995) (despite statute providing for appointed post-conviction counsel, there is no cognizable claim of ineffective assistance of post-conviction counsel); or that, when statutory appointment of counsel is discretionary, there is no right to effective post-conviction counsel, see *Bejarano v. Warden*, 929 P2d 922, 925 (Nev. 1996) (since petitioner is not statutorily entitled to post-conviction counsel, there is no viable claim of ineffective assistance of post-conviction counsel); or that there is a full statutory right to effective assistance of post-conviction counsel, see *Lozada v. Warden*, 613 A2d 818, 821-824 (Conn. 1992) (claim of ineffective assistance of post-conviction counsel is a viable claim because statute requires the appointment of post-conviction counsel). We note that federal law specifically prohibits a claim of ineffective assistance of state or federal habeas corpus counsel as a ground for a state prisoner obtaining federal habeas corpus relief. 28 USC § 2254 (i).

of lack of fundamental fairness, Gibson asserts that Georgia is one of only two states that does not permit appointed counsel for indigent death-sentenced habeas corpus petitioners. However, closer examination reveals that no state, save for Mississippi, has recognized a *constitutional* right to appointed counsel upon habeas corpus. See *Jackson v. State*, No. 98-DR-00708-SCT, 1999 WL 33904 (Miss. Jan. 28, 1999). Almost every jurisdiction that provides state-funded counsel to indigent death-row habeas corpus petitioners does so by statute. See Ala. Code § 15-12-23 (a) (1995) (subject to judicial discretion); Ariz. Rev. Stat. Ann. §§ 13-4041 (B), 13-4234 (D) (West Supp. 1998); Ark. Code Ann. § 16-91-202 (a) (1) (Michie Supp. 1997); Cal. Gov't Code § 68662 (West Supp. 1999); Colo. Rev. Stat. § 21-1-104 (1997); Conn. Gen. Stat. § 51-296 (a) (1998); Fla. Stat. Ann. § 27.702 (West Supp. 1999); Idaho Code § 19-4904 (Michie 1997) (subject to judicial discretion); 725 Ill. Comp. Stat. Ann. § 5/122-2.1 (a) (1) (West 1992); Ind. Code Ann. § 33-1-7-2 (a) (Lexis 1998); Kan. Stat. Ann. § 22-4506 (1995) (subject to judicial discretion); Ky. Rev. Stat. Ann. § 31.110 (2) (c) (Banks-Baldwin 1991); La. Code Crim. Proc. Ann. art. 930.7 (West 1997) (subject to judicial discretion); Md. Ann. Code art. 27, § 645A (f) (1) (1998); Mo. Ann. Stat. § 600.042 (West Supp. 1999); Mont. Code Ann. § 46-21-201 (1997); Neb. Rev. Stat. Ann. § 29-3004 (Michie 1995) (subject to judicial discretion); Nev. Rev. Stat. Ann. § 34.750 (1) (Michie 1996) (subject to judicial discretion); N.J. Stat. Ann. § 2A:158A-5 (West Supp. 1998); N.Y. Jud. Law § 35-b (McKinney Supp. 1999); N.C. Gen. Stat. § 7A-451 (a) (2) (1995); Ohio Rev. Code Ann. §§ 120.06, 120.16, 120.26 (Anderson 1998) (subject to public defender discretion); Okla. Stat. Ann. tit. 22 § 1355.6 (B) (West Supp. 1999); Or. Rev. Stat. § 138.590 (3) (1990); S.C. Code Ann. § 17-27-160 (B) (West Supp. 1998); S.D. Codified Laws § 21-27-4 (Michie 1987); Tenn. Code Ann. § 40-30-306 (a) (1997); Tex. Crim. P. Code Ann. § 11.071 (West Supp. 1999); Utah Code Ann. § 78-35a-202 (1998); Va. Code Ann. § 19.2-163.7 (Michie 1995); Wash. Rev. Code Ann. § 10.73.150 (West Supp. 1998); see also 21 USC § 848 (q) (4) (B) (right to qualified legal representation for capital petitioners in federal habeas corpus proceedings).[5] The contemporary practice thus illustrates that a law providing appointed counsel to indigent death-row habeas petitioners usually results from legislative enactment, not judicial fiat.

Gibson claims that Georgia is constitutionally required to pro-

---

[5] We note that some of these statutes were recently enacted so that the states could opt-in to Chapter 154 of the federal Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 18 USC §§ 2254 and 2261-2266. See, e.g., Ark. Code Ann. § 16-91-204 (1997) (legislative intent of statute requiring appointed counsel in capital post-conviction proceedings is to obtain expedited federal review under the AEDPA).

vide counsel in death penalty habeas corpus proceedings in order to ensure the fundamental fairness of Georgia's death penalty procedures and meaningful access to the courts. This assertion, which ignores the collateral purpose of habeas corpus, would lead to the judicial creation of a right not found in the federal or state constitutions, or resulting from the exercise of the legislative process. We do not say that a law providing state-funded counsel to indigent death-row habeas petitioners lacks merit. In fact, such a law might be good policy. "But, while we have an obligation to insure that constitutional bounds are not overreached, we may not act as judges as we might as legislators." *Gregg*, 428 U. S. at 174-175. A law requiring appointed counsel for capital habeas petitioners is not constitutionally compelled, and therefore, the decision to create such a law rightfully belongs to the General Assembly.

2. Gibson alleges that his trial counsel was ineffective due to numerous errors and omissions, including failure to object to preserve error at trial, failure to make important pretrial motions, and failure to adequately investigate and present key mitigation evidence. Gibson's trial counsel testified at the habeas corpus evidentiary hearing and we have examined the record from that hearing and the record of Gibson's trial and direct appeal.

In order to prevail on a claim of ineffective assistance of counsel, Gibson must show that his trial counsel's performance was deficient and that this deficient performance actually prejudiced his defense. *Strickland*, 466 U. S. at 687; *Smith*, 253 Ga. at 783 (1). Under this standard, Gibson's trial counsel is afforded a strong presumption that his performance fell within a wide range of reasonable professional conduct. *Smith*, supra. To show actual prejudice, Gibson must demonstrate that, but for trial counsel's deficient performance, there is a reasonable probability that the result of the trial would have been different. Id.

Based on the record, we are able to determine the following: Gibson's counsel, William Dennis Mullis, was appointed to defend Gibson shortly after his arrest. Mr. Mullis was the contract public defender for the judicial circuit, and had previously defended two death penalty cases. Mullis met with Gibson many times before trial and found him to be rational and cooperative. Gibson was able to assist Mullis by providing the names of potential mitigation witnesses.

The evidence of Gibson's guilt was overwhelming. A witness saw and recognized Gibson running from the grocery store immediately after the killing. A police officer, acting on this information, went to Gibson's house only 15 minutes after the murder, and was invited inside by Gibson's grandmother. The police officer followed a trail of fresh blood droplets back to Gibson's bedroom where he discovered

bloody money, bloody clothes and the victim's wallet. Gibson was found hiding in a closet. His shoes were consistent with bloody shoe prints found in the grocery store. Gibson gave two statements, one written and one videotaped. In both statements he confessed to the murder and armed robbery.

Mullis investigated Gibson's case. He examined the entire state's file because the district attorney had an open file policy. He interviewed several law enforcement witnesses and the woman who had seen and recognized Gibson leaving the grocery store after the murder. He called the doctor who conducted the autopsy. Mullis filed several discovery motions, including a *Brady* motion, and he attempted to subpoena employees of the state crime lab to produce their testing materials. In addition to a court-ordered psychological evaluation to determine competency, Mullis successfully moved for an independent psychological evaluation.

Mullis filed additional pretrial motions. He moved to suppress the items discovered in Gibson's bedroom, claiming an illegal warrantless search. He moved to suppress Gibson's statements, claiming that Gibson had been under the influence of narcotics when he waived his *Miranda* rights. Mullis also moved for a change of venue because there had been several articles in local newspapers that he believed to be inflammatory. The trial court reserved ruling on the change of venue request until the completion of voir dire, and then denied it due to the few jurors biased by pretrial publicity. The trial court granted a motion requesting the completion of a pretrial juror questionnaire.

The psychologist who performed the court-ordered evaluation was Dr. Robert J. Storms. Dr. Storms determined that Gibson was competent to stand trial and was not insane at the time of the murder. Mullis contacted Dr. Storms regarding possible mitigation issues and Dr. Storms informed him that Gibson's IQ was in the 80s, and that he was not mentally retarded. Dr. Storms also told Mullis that he had not uncovered any past history of child abuse, and that Gibson had been in considerable trouble with the law, leading to stays in various youth detention institutions. Dr. Storms stated that Gibson "had not had a particularly wonderful upbringing" and "it seems like he essentially raised himself."

Another psychologist, Dr. George T. Anderson, performed the independent examination of Gibson. He reported to Mullis that Gibson had a tested IQ of 76, which is borderline intelligence, but that Gibson was "certainly not retarded." Dr. Anderson stated that Gibson's IQ was probably five or six points higher than he tested because Gibson had not tried very hard on the test — he "didn't act like he cared one way or the other." Dr. Anderson also reported that Gibson's mother died when he was two years old, that his father had not been

involved in his life, and that he was raised by an aunt in Maryland. Gibson abused alcohol and drugs, and had spent some time in a juvenile facility and a Florida jail for a variety of offenses. Gibson has no brothers or sisters.

Mullis contacted Gibson's family members about possible mitigation evidence. The aunt who raised Gibson, Faustine Christopher, agreed to testify. Mullis also spoke with another aunt and Gibson's grandmother. Gibson told Mullis that Christopher had used corporal punishment on him, but no relatives corroborated any history of childhood abuse. Although Gibson's grandmother lived in Dodge County, she did not testify because she "didn't want to get involved" and Mullis believed that she could not offer much favorable evidence. Mullis did locate an acquaintance in Dodge County who agreed to testify about Gibson's peaceful nature (Gibson had only lived in Dodge County about two months before the murder).

Despite the overwhelming evidence of Gibson's guilt, Mullis did not believe anything would be gained by pleading guilty and going to trial only on sentencing. At trial, Mullis successfully moved to prevent the jury from seeing the video portion of Gibson's confession because it depicted Gibson wearing handcuffs,[6] and he was successful in keeping out cumulative photographs of the victim's body. Mullis was also concerned about the autopsy report, which indicated that the victim had been paralyzed from the neck down by the stab wound that broke the knife blade. He believed that this would be very damaging aggravation evidence because the jury would hear that Gibson had continued to assault a helpless victim. After the autopsist testified that the neck wound had left the victim as helpless as a "rag doll" and that Gibson had continued to stab with the remnant of the knife, Mullis managed to impeach the autopsist with a statement he made to Mullis during their pretrial telephone conversation. The doctor conceded that the neck wound that resulted in the broken blade could have been the final wound.

During the sentencing phase, the state introduced evidence of an escape attempt by Gibson. Three months before trial, Gibson escaped from his cell at the city jail and was caught inside the building. The police discovered a letter addressed "To the Police" on Gibson's bunk when they first noticed he was missing. Gibson's letter described his "magnificent escape" in a mocking, condescending tone. The letter and police testimony about the escape were introduced over defense objection. To counter this evidence, Mullis used Gibson's testimony in the sentencing phase to explain that this event was not actually an

---

[6] Mullis believed that it was important to prevent the jury from seeing the video because of Gibson's remorseless demeanor during his confession. The jury was permitted to hear the confession.

escape but an attempt to get transferred from the city jail to the county jail, which Gibson believed to be more comfortable. Regarding the letter, Mullis testified at the habeas corpus hearing that he had warned Gibson, as he does all his clients, not to write anything in jail that could be used by the state, but Gibson had ignored him.

Mullis testified that his mitigation strategy was "two-pronged." He planned to focus on Gibson's youth (17 years old at the time of the murder) and his lack of a home life while growing up. Gibson's aunt, Faustine Christopher, testified that Gibson's father had left his mother when Gibson was only a few months old, and that his parents had never been married. When Gibson was only two years old, his mother was murdered. Ms. Christopher further testified that she raised Gibson, who was a playful child until he began to get into trouble when he was 14 years old. Another witness, Sharon Jordan, testified that she had known him during the short time he had lived in Dodge County and that he had a peaceful nature. Then Gibson testified, expressing remorse and explaining that he had been high on drugs when he killed the victim. He also testified that he was only 17 years old when he committed the murder. In his closing argument, Mullis invoked Gibson's youth and his lack of a family while growing up. He implored the jury to spare Gibson, saying to do so would be Christian. The jury returned a recommendation of death.

Mullis's representation of Gibson was not deficient. See *Strickland*, 466 U. S. at 687. Mullis investigated Gibson's possible defenses, interviewed key witnesses, and discovered that Gibson was competent and not mentally retarded. Mullis therefore elected to present evidence in the sentencing phase of Gibson's youth, his remorse, and his childhood without parents. We cannot conclude that this decision was not made in the exercise of reasonable professional judgment. Id. at 690; *Smith*, 253 Ga. at 783 (1). In addition, the record reveals that Mullis filed numerous relevant pretrial motions and made timely objections at trial. Mullis's conduct fell within the wide range of reasonable professional conduct permitted in *Strickland*. Id.

Furthermore, even if we were to assume that Gibson's counsel was deficient, Gibson cannot show actual prejudice. *Strickland*, 466 U. S. at 694; *Smith*, supra. The murder was extremely brutal; the victim was savaged with dozens of stab and slash wounds. The attack was so violent the victim's spinal cord was severed and knife blows to the head resulted in superficial skull fractures. In his recorded statement, Gibson told the police that he had entered the store and begun stabbing the victim without saying anything or giving the victim a chance to turn over the money without a fight. He said that he had no regrets about what he had done. Gibson's escape attempt, in conjunction with his mocking letter to the police, also showed that he was a difficult prisoner and an escape risk. In addition, two psycho-

logical examinations revealed that Gibson was not mentally ill or retarded. Under these circumstances, Gibson cannot demonstrate that there was a reasonable probability that, assuming his lawyer's representation was deficient, the outcome of his trial would have been different. Id. The habeas court did not err by denying Gibson's claim of ineffective assistance of trial counsel.

3. Gibson asserts that the habeas court erred by scheduling his case to conform with the time limits established by Uniform Superior Court Rule 44 for the litigation of a capital habeas corpus case. This claim is without merit. *Davis v. Thomas*, 266 Ga. 835, 838 (471 SE2d 202) (1996) (habeas court has broad discretion in controlling its calendar).

4. The habeas court's adoption of a final order drafted by the state was not error. *Jefferson v. Zant*, 263 Ga. 316, 316-317 (1) (431 SE2d 110) (1993).

5. Gibson's remaining habeas claims are procedurally defaulted because they could have been raised on direct appeal and were not. *Black*, 255 Ga. at 240 (4); OCGA § 9-14-48 (d). These claims include allegedly prejudicial remarks made by the state in its closing argument, the state's alleged failure to disclose exculpatory evidence, and the constitutionality of the Unified Appeal Procedure.

*Application for certificate of probable cause to appeal denied. All the Justices concur, except Benham, C. J., Fletcher, P. J., and Sears, J., who dissent.*

FLETCHER, Presiding Justice, dissenting.

I dissent because the state and federal constitutions require appointment of counsel for a death penalty inmate who is pursuing his first habeas corpus petition and who is seeking to challenge his conviction and sentence on a basis not available on direct appeal.[7] Counsel for this habeas petitioner is required in order to protect the constitutional guarantee of meaningful access to the courts because of the complexity of habeas corpus law and the importance of habeas review in ensuring fundamental fairness in capital cases.

The same counsel represented Gibson at trial and on direct appeal. This habeas petition is therefore Gibson's first opportunity to challenge his conviction and sentence on the ground of ineffective assistance of counsel.[8] The habeas court denied the motion of amicus for a continuance for obtaining pro bono counsel and conducted an

---

[7] Although the posture of this case is a request for a certificate of probable cause to appeal, the issue of Gibson's right to counsel has been fully briefed by both sides and the record of the habeas court is before us. Additionally, the Court has the benefit of amicus briefs.

[8] *Castell v. Kemp*, 254 Ga. 556, 558 (331 SE2d 528, 530) (1985).

evidentiary hearing over Gibson's objection that he had no attorney. The record shows that Gibson has an eighth grade education and is in the "borderline range of intelligence" with an IQ between 76 and 82. Following the hearing, the court made an ex parte request of the state to prepare an order, which the court then adopted verbatim.

The Georgia Constitution guarantees the right to seek habeas corpus relief.[9] The right to seek habeas review includes the right to meaningful access to the courts to pursue the habeas challenge.[10] As this Court recently stated, "[p]risoner access to the courts in order to challenge unlawful convictions . . . cannot be unjustifiably denied or obstructed."[11] The federal constitution provides similar protections.[12] The question becomes whether meaningful access and fundamental fairness require appointment of counsel in a capital post-conviction proceeding that provides the first opportunity to raise a constitutional challenge to the conviction and sentence. This is a question that the United States Supreme Court has never addressed and has specifically left open.[13]

The majority's reliance on *Murray v. Giarratano*[14] and *State v. Davis*[15] is unpersuasive because neither case involved a death penalty inmate who was forced to proceed at his first habeas proceeding without counsel. *Giarratano* was not a habeas proceeding, but was a civil rights case seeking broad prospective relief. As Justice Kennedy observed in casting the deciding vote in *Giarratano*, Virginia already provided institutional lawyers to assist in preparing postconviction petitions and "no prisoner on death row in Virginia has been unable to obtain counsel to represent him in post conviction proceedings."[16] Similarly, Davis was never without counsel; he was simply without compensated counsel.[17] In *Davis*, this Court held only that the trial court erred in "appointing" the Prisoner Legal Counseling Project, and thus providing for payment.[18] The Court noted that lawyers with

---

[9] Ga. Const. Art. I, §. I, Par. XV.

[10] See *Howard v. Sharpe*, 266 Ga. 771, 772 (470 SE2d 678) (1996); *Giles v. Ford*, 258 Ga. 245 (368 SE2d 318) (1988); *Johnson v. Caldwell*, 229 Ga. 548, 550 (192 SE2d 900) (1972).

[11] *Howard v. Sharpe*, 266 Ga. 771, 772 (470 SE2d 678) (1996).

[12] *Lewis v. Casey*, 518 U.S. 343 (116 SC 2174, 2182, 135 LE2d 606) (1996) (state must provide "tools . . . inmates need in order to attack their sentences, directly or collaterally"); *Bounds v. Smith*, 430 U.S. 817, 821-823 (97 SC 1491, 52 LE2d 72) (1977) (prisoners have constitutional right to meaningful access to the courts).

[13] See *Coleman v. Thomas*, 501 U.S. 722, 755 (111 SC 2546, 115 LE2d 640) (1991).

[14] 492 U.S. 1 (109 SC 2765, 106 LE2d 1) (1989).

[15] 246 Ga. 200 (269 SE2d 461) (1980).

[16] *Giarratano*, 109 SC at 2773 (Kennedy, J., concurring).

[17] Davis' pro bono counsel continued to represent him through a second reversal in federal habeas proceedings and finally a guilty plea in exchange for a life without parole sentence. See *Davis v. Kemp*, 752 F.2d 1515 (11th Cir. 1985); *Davis v. State*, 261 Ga. 221, 222 (403 SE2d 800) (1991); *Metro and State in Brief*, ATLANTA CONST., May 29, 1993 at B2.

[18] 246 Ga. at 201.

the PLCP were already providing legal advice and representation on a volunteer basis.[19]

The first factor to consider in addressing the question of whether the constitution requires appointed counsel is the nature of the proceedings. The United States Supreme Court has recognized that an attorney's assistance in capital post-conviction proceedings is "crucial because of the complexity of . . . jurisprudence in this area."[20] As Justice Kennedy observed in *Giarratano*, post-conviction proceedings are a "central part of the review process for prisoners sentenced to death."[21] Troubling statistics confirm this: nearly half (46%) of all capital cases reviewed in federal habeas proceedings between 1976 and 1991 were found to have constitutional error.[22] In 1996, this Court also recognized the importance of counsel when Chief Justice Benham sent letters to approximately 80 law firms across this state requesting that each firm agree to represent an individual in a capital post-conviction case on a pro bono basis. As this case demonstrates, however, reliance on pro bono counsel is no longer adequate. Recently, the Supreme Court of Mississippi recognized that such reliance is insufficient and granted a motion for appointed and compensated counsel for a death row inmate in state post-conviction proceedings.[23] That court recognized that the uniqueness of death as a sentence and the complexity of post-conviction procedures require counsel in order to provide meaningful access to the courts.[24]

The need for counsel is even greater with the passage of the Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254, 2262-66, Georgia's Death Penalty Habeas Corpus Reform Act of 1995, OCGA § 9-14-44, et seq., and Uniform Superior Court Rule 44. Together these enactments impose strict time limitations on habeas petitions in death penalty cases. A prisoner sentenced to die must file his or her federal habeas petition within one year of the conviction becoming final, with tolling allowed if state post-conviction proceedings are pending.[25] In Georgia, Rule 44 requires that a habeas petitioner file all pretrial motions within 60 days of filing a petition and complete discovery within 120 days. Rule 44 also requires the evidentiary hearing to be conducted within 180 days of the filing of the petition. Failure to meet these requirements will result in the absence of any hearing on the merits for the habeas

---

[19] Id.

[20] *McFarland v. Scott*, 512 U.S. 849, 855 (114 SC 2568, 129 LE2d 666) (1994).

[21] 492 U.S. at 14 (Kennedy, J., concurring).

[22] *McFarland v. Scott*, 512 U.S. 1256, 1263 (114 SC 2785, 129 LE2d 896) (1994) (mem.) (Blackmun, J., dissenting).

[23] *Jackson v. State*, No. 98-DP-00708-SCT, 1998 WL 469953 (Miss. Jan. 28, 1999).

[24] Id.

[25] 28 U.S.C. § 2244(d)(1).

petitioner. Furthermore, as the State Bar of Georgia points out in its amicus brief, the strict time limits of this rule actually discourage lawyers from accepting the Chief Justice's plea for pro bono assistance because the rules do not permit adequate time to become familiar with the Byzantine requirements of habeas corpus law.

It is also important to consider the claims being raised in the habeas petition. In this case, Gibson is seeking to challenge the effectiveness of his trial counsel, an issue that he has not been able to assert previously. It is well-established that indigent defendants are entitled to counsel for the direct appeal from the judgment of conviction and sentence.[26] A state that permits a defendant to raise a constitutional challenge to his death sentence only after the right to counsel has expired is treading heavily on the Sixth Amendment right to counsel, especially in light of the unusual importance of post-conviction proceedings in capital cases. Repeated reversals of convictions and death sentences in habeas proceedings demonstrate that the protections given in the trial and direct appeal stages of death penalty cases are often not sufficient to assure their reliability.[27] The fact that death sentences are not reimposed following a successful habeas petition underscores the importance of the habeas proceed-

---

[26] *Douglas v. California*, 372 U.S. 353, 358 (83 SC 814, 9 LE2d 811) (1963).

[27] See, e.g., *Roberts v. State*, 263 Ga. 764 (438 SE2d 905) (1994) (referring to unpublished habeas decision reversing conviction and sentence); *Nelson v. Zant*, 261 Ga. 358 (405 SE2d 250) (1991); *Ross v. Kemp*, 260 Ga. 312 (393 SE2d 244) (1990) (per curiam); *Birt v. State*, 259 Ga. 800 (387 SE2d 879) (1990) (referring to unpublished habeas decision vacating death sentence); *Curry v. Zant*, 258 Ga. 527 (371 SE2d 647) (1988); *Hardy v. State*, 258 Ga. 523 (371 SE2d 849) (1988) (referring to unpublished habeas decision vacating death sentence); *Stynchcombe v. Floyd*, 252 Ga. 113 (311 SE2d 828) (1984); *Zant v. Hamilton*, 251 Ga. 553 (307 SE2d 667) (1983); *Jarrell v. Kemp*, 248 Ga. 492 (284 SE2d 17) (1981); *Zant v. Gaddis*, 247 Ga. 717 (279 SE2d 219) (1981); *Amadeo v. Zant*, 486 U.S. 214 (108 SC 1771, 100 LE2d 249) (1988); *Dobbs v. Turpin*, 142 F.3d 1383 (11th Cir. 1998); *Hill v. Turpin*, 135 F.3d 1411 (11th Cir. 1998); *Baxter v. Thomas*, 45 F.3d 1501 (11th Cir. 1995); *Davis v. Zant*, 36 F.3d 1538 (11th Cir. 1994); *Burden v. Zant*, 24 F.3d 1298 (11th Cir. 1994); *Moore v. Zant*, 972 F.2d 318 (11th Cir. 1992); *Horton v. Zant*, 941 F.2d 1449 (11th Cir. 1991); *Cunningham v. Zant*, 928 F.2d 1006 (11th Cir. 1991); *Berryhill v. Zant*, 858 F.2d 633 (11th Cir. 1988); *Cervi v. Kemp*, 855 F.2d 702 (11th Cir. 1988); *Corn v. Kemp*, 837 F.2d 1474 (11th Cir. 1988); *Godfrey v. Kemp*, 836 F.2d 1557 (11th Cir. 1988); *Dick v. Kemp*, 833 F.2d 1448 (11th Cir. 1987); *Bowen v. Kemp*, 832 F.2d 546 (11th Cir. 1987) (en banc) (reversing convictions of Charles Bowen and Horace William Dix); *Brooks v. Kemp*, 809 F.2d 700 (11th Cir. 1987); *Thomas v. Kemp*, 800 F.2d 1024 (11th Cir. 1986); *Thomas v. Kemp*, 796 F.2d 1322 (11th Cir. 1986); *Wilson v. Kemp*, 777 F.2d 621 (11th Cir. 1985); *Ruffin v. Kemp*, 767 F.2d 748 (11th Cir. 1985); *Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985) (en banc); *Blake v. Kemp*, 758 F.2d 523 (11th Cir. 1985); *Wallace v. Kemp*, 757 F.2d 1102 (11th Cir. 1985); *Tyler v. Kemp*, 755 F.2d 741 (11th Cir. 1985); *Morgan v. Zant*, 743 F.2d 775 (11th Cir. 1984); *Strickland v Francis*, 738 F.2d 1542 (11th Cir. 1984); *Goodwin v Balkcom*, 684 F.2d 794 (11th Cir. 1982); *Young v. Zant*, 677 F.2d 792 (11th Cir. 1982); *Buttrum v. Black*, 721 F. Supp. 1268 (N.D. Ga. 1989), *aff'd per curiam*, 908 F.2d 695 (1990); *Jones v. Kemp*, 706 F. Supp. 1534 (N.D. Ga. 1989); *Smith v. Kemp*, 664 F. Supp. 500 (M.D. Ga. 1987), *aff'd by equally divided court*, 887 F.2d 1407 (11th Cir. 1989); *Johnson v. Kemp*, 615 F. Supp. 355 (S.D. Ga. 1985), *aff'd per curiam*, 781 F.2d 1482 (1986).

ing.[28] Furthermore, the United States Supreme Court has previously recognized that due process may require appointment of counsel in circumstances where the risk of an erroneous decision is not nearly so great as in death penalty litigation: in proceedings to terminate parental rights,[29] adjudicate juvenile delinquency,[30] transfer prisoners to a state mental hospital,[31] and revoke parole,[32] and to misdemeanor criminal trials where even one day of imprisonment is imposed.[33]

In determining the requirements of "fundamental fairness," another relevant inquiry is the contemporary practice.[34] The federal government[35] and all other states provide a right to counsel in capital post-conviction proceedings.[36] Georgia is the only jurisdiction that

---

[28] Follow-up research on the defendants whose cases are cited in n. 27 above shows that three were wrongly convicted, see *Wallace v. State*, 188 Ga. App. 77 (317 SE2d 914) (1988) (acquitted of murder at second trial); *Special Update: Georgia's Death Row*, ATLANTA CONST., Nov. 17, 1996 at G8 (Gary Nelson was released after state withheld exculpatory information and did not retry him; Henry Arthur Drake was resentenced to life, but was released when it was learned that the state's main witness had lied). None of the others are currently under a death sentence. See *Young v. Kemp*, 760 F.2d 1097 (11th Cir. 1985) (en banc), (state barred from seeking death penalty in retrial); *Brooks v. State*, 262 Ga. 187 (415 SE2d 903) (1992) (following second trial in which the state sought the death penalty, he received a life sentence); see also *Special Update: Georgia's Death Row*, ATLANTA CONST., Nov. 17, 1996 at G8 (Victor Vernard Roberts and Eddie Lee Ross pled guilty and received life sentences; Walter Curry pled guilty and received a sentence of life without parole; David Alfred Jarrell's second death sentence was reversed, see *Jarrell v. State*, 261 Ga. 880 (413 SE2d 710) (1992), and he pled guilty and promised not to seek parole; Tony Amadeo pled guilty and was sentenced to life after this Court reversed refusal to appoint previous counsel for retrial, *Amadeo v. State*, 259 Ga. 469 (384 SE2d 181) (1989); Janice Buttrum pled guilty and promised not to seek parole; Alphonso Morgan faced a second sentencing trial, see *Morgan v. State*, 257 Ga. 596 (361 SE2d 793) (1987), but was resentenced to life); Kenneth Hardy, John Michael Davis, Jimmie Burden, Jimmy Lee Horton, James Cunningham, Michael Gene Berryhill, Michael Albert Cervi, Charles Corn, Robert Franklin Godfrey, Dennis Dick, Charles Bowen, Horace William Dix, Donald Wayne Thomas, Joseph Wilson, Jr., Judson Ruffin, Joseph James Blake, Shirley Tyler, Robert William Strickland, William Alvin Smith and Johnny L. Johnson were resentenced to life; Bobby Gene Gaddis awaits resentencing following the 1981 vacating of the death penalty; Billy Sunday Birt, Norman Darnell Baxter, Carzell Moore, and Brandon Jones await resentencing); *Retrial like a 'reunion' in Cobb*, ATLANTA CONST., Feb. 22, 1999 at B1 (Floyd Ernest Hill was released after state could not find reliable witnesses to retry case). Whether Terry Lee Goodwin and Joseph Edward Thomas have been retried and sentenced is unclear; whether Gary Michael Floyd, Roland Paul Hamilton, and Wilburn Wiley Dobbs have been resentenced is unclear.

[29] *Lassiter v. Department of Social Servs.*, 452 U.S. 18 (101 SC 2153, 68 LE2d 640) (1981).

[30] *In re Gault*, 387 U.S. 1, 41 (87 SC 1428, 18 LE2d 527) (1967).

[31] *Vitek v. Jones*, 445 U.S. 480, 496-497 (100 SC 1254, 63 LE2d 552) (1980).

[32] *Gagnon v. Scarpelli*, 411 U.S. 778, 791 (93 SC 1756, 36 LE2d 656) (1973).

[33] *Argersinger v. Hamlin*, 407 U.S. 25, 37 (92 SC 2006, 32 LE2d 530) (1972).

[34] See *Cooper v Oklahoma*, 517 U.S. 348 (116 SC 1373, 1380, 134 LE2d 498) (1996).

[35] 21 U.S.C. § 848(q)(4)(B).

[36] The Spangenberg Group, *"An Updated Analysis of the Right to Counsel and the Right to Compensation and Expenses in State Post-Conviction Death Penalty Cases,"* (American Bar Association Post-Conviction Penalty Representation Project, June 1996).

fails to provide a right to counsel in capital post-conviction cases.[37] While it is true that the mechanism for appointed counsel in capital habeas proceedings usually has come about through the state legislature, this fact is irrelevant for constitutional analysis. If, as the majority concedes, contemporary practice is relevant to determining the *constitutional* requirements, then there is no rational basis for distinguishing the source.[38] The fact that other state legislatures have provided for counsel in capital post-conviction proceedings may be a strong policy consideration for Georgia's legislature, but it is a weak excuse for this Court to evade its responsibility to ensure the guarantees of the constitution.

The ultimate consideration and the one that underlies all these arguments is that death is different. Its finality as punishment demands special consideration.[39] The majority's response to the reality that "death is different" is to focus on the facts of this case and make the subjective determination that Gibson deserves the death penalty. That decision is never appropriate for this Court to make; it is the province of the jury. Even if it were an appropriate determination for this Court, it cannot justify the denial of due process. The majority's subjective conclusion that Gibson deserves the death penalty ignores the tenet that "fundamental fairness is the central concern of the writ of habeas corpus."[40] When a petitioner is on death row and pursuing his first habeas petition, there can be no glimmer of hope that fundamental fairness will prevail in the absence of counsel and, without a procedure for appointed counsel, the right to meaningful access to habeas review under the Georgia Constitution is lost.

For all these reasons, I conclude that meaningful access to the right to seek habeas relief and fundamental fairness in those proceedings demand appointment of counsel for Gibson and I would reverse and would order a new habeas hearing following appointment of counsel.

---

[37] Id. As of the date of the Spangenberg Group report, Wyoming also failed to provide counsel for death penalty inmates in post-conviction proceedings. However, Wyoming recently changed its law and now death penalty inmates are entitled to representation by the Wyoming state public defender in post-conviction proceedings. SEA 41, 55th Leg., 1999 Session (Wyo.) (to be codified at Wyo. Stat. Ann. § 7-6-104(c)(ii) (1999).

[38] *Cooper*, 116 SC at 1380 (In considering constitutionality of procedural rule, Court surveyed contemporary practice set forth in case law and statutes of the various states).

[39] *Ake v. Oklahoma*, 470 U.S. 68, 87 (105 SC 1087, 84 LE2d 53) (1985) (Burger, C.J., concurring) ("In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases."); *California v. Ramos*, 463 U.S. 992, 998-999 (103 SC 3446, 77 LE2d 1171) (1983) ("qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.").

[40] *Strickland v. Washington*, 466 U.S. 668, 697 (104 SC 2052, 80 LE2d 674) (1984).

Because the Court has not granted the certificate for probable cause to appeal, nor given the parties the courtesy of an opportunity to submit briefs on the alleged constitutional errors during the trial, I further believe that it is inappropriate to consider those issues as the Court does in division 2.

I am authorized to state that Chief Justice Benham and Justice Sears join in this dissent.

SEARS, Justice, dissenting.

I fully concur with Presiding Justice Fletcher's dissent. The official taking of a human life is the ultimate governmental exercise of control and power over individual liberty. If it is to be done, it must be done cautiously, dispassionately, soberly, and fairly. And fundamental fairness demands that a condemned prisoner have the benefit of competent counsel to articulate his constitutional claims and to navigate the procedural and substantive morass that is our habeas corpus law. If this were not so, all states but one that impose the death penalty would not require counsel in these cases. Nevertheless, the majority today joins that one state and requires a condemned man, without counsel, to bring his claims for relief in an arcane process that he cannot possibly understand in a court of law that (most likely) will not be able to understand his constitutional concerns. This is an outcome that no just government should countenance.

I am authorized to state that Chief Justice Benham and Presiding Justice Fletcher join in this dissent.

DECIDED FEBRUARY 22, 1999 —
RECONSIDERATION DENIED APRIL 9, 1999.

*King & Spalding, Joseph R. Bankoff,* for appellant.
*Thurbert E. Baker, Attorney General, Paige Reese Whitaker, Assistant Attorney General,* for appellee.
*William P. Smith III, General Counsel State Bar, Bondurant, Mixson & Elmore, Emmet J. Bondurant, Rogers & Hardin, C. B. Rogers, Alston & Bird, G. Conley Ingram, Kilpatrick Stockton, Miles J. Alexander, Gambrell & Stolz, Linda A. Klein, David A. Webster, Gerald R. Weber, Jr.,* amici curiae.