738 So.2d 326 (1999)
Guillermo ARBELAEZ, et al., Petitioners,
v.
Robert A. BUTTERWORTH, etc., Respondent.
Capital Collateral Representative-Northern Region, et al., Petitioners,
v.
Harry K. Singletary, Jr., etc., Respondent.
Nos. 92288, 92595.
Supreme Court of Florida.
June 17, 1999.

ORDER
In February 1998, the Capital Collateral Regional Counsel for the Southern Region of Florida (CCRC-South) asked this Court to exercise its all writs jurisdiction to stay all applicable time limits, court proceedings, and executions until adequate funding was provided to CCRC or until July 1, 1998, the start of the next fiscal year. See Arbelaez v. Butterworth, No. 92,288 (Fla. petition filed Feb. 3, 1998). In its response, the State challenged the contention that there were not adequate funds, asserting that part of the funding crisis was being caused by the unauthorized use of part of those funds in civil litigation. The unauthorized civil litigation issue was resolved by this Court's opinion in State ex rel. Butterworth v. Kenny, 714 So.2d 404 (Fla.1998).
The Capital Collateral Regional Counsel for the Northern Region of Florida (CCRC-North) as well as CCRC-South each filed separate all writs petitions asking this Court to "impose a general moratorium on the imposition of the death penalty until the CCRCs are adequately funded pursuant to a caseload methodology." See Capital Collateral Representative-Northern Region v. Singletary, No. 92,595 (Fla. petition filed Mar. 18, 1998). We consolidated these cases and held oral argument on May 4, 1998.
Since these actions have been filed, the structure of the CCRC offices has been substantially modified, and the funding has significantly changed and increased through two legislative sessions. We acknowledge we have a constitutional responsibility to ensure the death penalty is administered in a fair, consistent and reliable manner, as well as having an administrative responsibility to work to minimize the delays inherent in the postconviction *327 process. We find, however, that the facts and the circumstances that brought forth these actions have substantially changed. Accordingly, there is no present case in controversy, and these petitions are hereby denied.
We commend the law firm of Holland and Knight for its valuable and conscientious pro bono representation in this case.
It is so ordered.
HARDING, C.J., SHAW, WELLS and PARIENTE, JJ., and OVERTON, Senior Justice, concur.
ANSTEAD, J., specially concurs with an opinion, in which KOGAN, Senior Justice, concurs.
ANSTEAD, J., specially concurring.
The petitioners have asked this Court to "impose a general moratorium on the imposition of the death penalty until the CCRCs are adequately funded pursuant to a caseload methodology." They also ask that we mandate extensive action and funding for collateral counsel by the legislature, and that we hold that a right to effective capital postconviction counsel exists under numerous provisions of Florida's Constitution.[1] I agree that affirmative relief should be denied in view of the actions taken by the legislature in the two sessions during which these proceedings have been pending. However, I would go ahead and formally acknowledge that the right to postconviction relief in capital cases is meaningless without a right to counsel.

ADEQUATE FUNDING
The Florida Legislature has acted to provide funds and resources to assure representation in capital collateral proceedings since 1985.[2] Importantly, in the 1998 and 1999 legislative sessions, the legislature has made significant strides in appropriating funds and implementing legislation intended to assist in alleviating the problems the CCRCs are experiencing. In fact, for the first time the legislature has enacted a scheme for the provision of counsel in capital collateral proceedings that attempts to provide some form of legal services for all death-sentenced defendants. This, of course, has been our goal for some time.[3]
*328 The legislature has enacted legislation to provide supplemental private counsel for capital collateral defendants and has specifically mandated that courts "shall monitor the performance of assigned counsel to ensure that the capital defendant is receiving quality representation. The court shall also receive and evaluate allegations that are made regarding the performance of assigned counsel." See Ch. 99-221, § 5, Laws of Fla., 1999 Fla. Sess. Law Serv. (West) (adding subsection (12) to section 27.711, Florida Statutes (1998 Supp.)). The staff analyses from both the Senate and the House specifically indicate that the legislature is concerned about compliance with this Court's decision in Makemson v. Martin County, 491 So.2d 1109 (Fla.1986). In Makemson, we recognized that courts have a constitutional obligation in capital cases to provide compensation for counsel in excess of statutory caps if necessary to assure adequate representation.
Despite this recent legislative action, the petitioners contend that this Court must command the legislature to provide additional funding and personnel to the CCRCs. According to the supporting study commissioned by Holland and Knight and attached to the petition, the funding of the CCRCs is still "woefully inadequate" and it will take 137 additional attorneys and 25 million additional dollars to properly represent the approximately 208 capital defendants assigned to the CCRCs.[4] This Court has previously acknowledged its responsibility to ensure that CCRC receive adequate funding. See Fla. R.Crim. P. 3.851 Court Commentary (1993) ("In the event the capital collateral representative is not fully funded and available to provide proper representation for all death penalty defendants, the reduction in the time period [for seeking relief under this rule] would not be justified and would necessarily have to be repealed, and this Court will forthwith entertain a petition for the repeal of the rule."). However, while I acknowledge that additional funding may still be necessary, I disagree that we must suspend all collateral proceedings and compel the legislature to apply a particular funding formula for representation in capital collateral proceedings.[5]
*329 Fortunately, the legislature has recognized the critical importance of counsel in postconviction proceedings in capital cases and has attempted to provide counsel, whether private or institutional, at an early date in the proceedings. Further, as noted above, the legislature has provided additional funding and enacted legislation to assist in providing additional representation to capital collateral defendants. Clearly, the allocation of resources to fund postconviction relief counsel to capital defendants should ordinarily be a matter of legislative choice and policy. We are obligated to give considerable deference to the legislature's response to this obligation.

STATE DUE PROCESS
Notwithstanding our conclusion that we should not interfere with the legislature's good faith attempts to deal with this difficult and complex issue, I also recognize that we have been less than clear in the message we have sent out concerning the essential requirement for counsel in capital postconviction proceedings. On the one hand, we have in fact consistently refused to permit a death-sentenced defendant to be executed without attorney-assisted collateral review of the original trial proceedings.[6] On the other hand, some two decades ago we sent out an ambiguous, if not implicitly contradictory signal, when we declined to recognize a specific constitutional obligation of the State for provision of postconviction counsel in capital cases, while at the same time recognizing a limited constitutional due process right to counsel in all postconviction proceedings. See Graham v. State, 372 So.2d 1363 (Fla. 1979).[7]
The past twenty years have seen a hodge-podge of approaches, ranging from no counsel, to volunteer counsel, to federally funded counsel, and more recently to state-provided institutional counsel and state-funded private counsel. In many instances counsel has come and gone in a haphazard fashion or, more often than not, has only participated in a crisis situation, as when a death warrant was issued. It is apparent that our prior failure to recognize a clear-cut right to counsel has only contributed to the confusion and delay in capital proceedings because of the uncertainty and unevenness of representation and the *330 consequent doubt and lack of confidence in an outcome untested by a meaningful collateral review.
While we have been less than clear in our response to the need for counsel, other courts have not.[8] For example, the Mississippi Supreme Court has recently held that provision for counsel is constitutionally mandated in postconviction proceedings in capital cases. Jackson v. State, 1999 WL 33904, 732 So.2d 187 (Miss.1999). The Mississippi Supreme Court in Jackson succinctly explained the absolute necessity of collateral proceedings in capital cases since those proceedings provide the only opportunity for important constitutional issues such as the adequacy of trial counsel's performance to be considered. The court further pointed out the reality that individual death-sentenced defendants could hardly represent themselves in the uniquely difficult and complicated area of capital postconviction litigation.
Like the Mississippi Supreme Court, I believe we should go ahead and formally acknowledge today what we in fact have implied by our prior actions in insisting that death-sentenced defendants not be executed without provision for counsel-assisted collateral review of the proceedings resulting in a sentence of death. As noted above, we have consistently refused to permit an execution to be carried out absent a record demonstrating that a death-sentenced defendant has received the assistance of counsel in a meaningful postconviction proceeding. By doing so, we have in effect enforced a state constitutional right to counsel without formally announcing the basis of our action.[9] I see no need to continue to withhold that formality.
In Graham we recognized a constitutional due process right to counsel generally in postconviction proceedings in any criminal case where a substantial issue was raised and the trial court determined that a proper resolution of the issue would require the assistance of counsel. Ironically, since Graham, convicted defendants in run-of-the-mill burglary cases, or other less serious crimes, have been held constitutionally entitled to counsel in postconviction proceedings, while defendants in complex capital cases have not. In fact, although the rule of Graham mandating the appointment of counsel in difficult cases obviously would apply to all cases, we have been cited to no case where counsel has been appointed under Graham in a capital case. Further, since our decision in Graham we have explicitly recognized that all capital litigation is particularly unique, complex and difficult. See White v. Board of County Comm'rs, 537 So.2d 1376 (Fla.1989).[10] Further, in *331 Graham we were then faced with only a handful of defendants while today there are hundreds of death-sentenced defendants on death row.
Since Graham, we have also enacted complex rules that expressly govern capital postconviction proceedings and discovery in those proceedings. We have shortened the time for filing petitions in capital cases to one year while allowing two years in other criminal cases. In addition, the critical importance of state postconviction proceedings has been magnified since the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254, 2262-66 (Supp. III 1997), severely restricting a death-sentenced defendant's access to the federal courts. In other words, today state postconviction proceedings are undeniably critical and complex, and by their very nature present the serious and difficult issues contemplated by Graham to require the assistance of counsel.
Our adversarial system of criminal justice depends almost entirely upon the procedural fairness and integrity of the process. This Court and the United States Supreme Court have held that the integrity of the process is of unique and special concern in cases where the State seeks to take the life of the defendant.[11]See, e.g., Monge v. California, 524 U.S. 721, 118 S.Ct. 2246, 2252-53, 141 L.Ed.2d 615 (1998); State v. Dixon, 283 So.2d 1 (Fla. 1973). See also Reid v. Covert, 354 U.S. 1, 77, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (Harlan, J., concurring):
So far as capital cases are concerned, I think they stand on quite a different footing than other offenses. In such cases the law is especially sensitive to demands for ... procedural fairness.... I do not concede that whatever process is "due" an offender faced with a fine or prison sentence necessarily satisfies the requirements of the Constitution in a capital case. The distinction is by no means novel, nor is it negligible, being literally that between life and death.
Of course, the assurance of that integrity in turn, is almost totally dependent upon the quality of legal representation provided to a capital defendant and the judiciary's vigilant supervision of the process. Society as a whole, as well as the two other branches of government, directly rely on the judiciary's vigilance in assessing the reliability of the death sentence process.[12] Accordingly, it is absolutely essential that the postconviction procedure we have put in place in capital cases to review and insure the integrity of the pretrial and trial process be fair and meaningful. In turn, it is apparent, as all have acknowledged, that for such proceedings to be fair and meaningful there must be provision for collateral review of death sentences with the assistance of counsel.
Our postconviction procedures were specifically enacted as an effective means to facilitate the processing of grievances concerning the pretrial and trial process previously addressed through the ancient writs of habeas corpus and coram nobis. These important postconviction proceedings can only work to provide meaningful *332 review of the process if an indigent death-sentenced defendant is provided with counsel who has the professional expertise and qualifications to review and evaluate the pretrial and trial process, including the performance of trial counsel. Obviously, a capital defendant imprisoned on death row has little or no ability or means to evaluate the fairness of these complex and sensitive legal proceedings or to evaluate trial counsel's competence and conduct. A provision for counsel in capital collateral proceedings is designed to insure that once the initial proceedings resulting in a death sentence have concluded there be a prompt and effective collateral review of those proceedings to be certain that no major flaws exist, such as a lack of competent trial or appellate counsel, that would seriously undermine our confidence in the outcome of those proceedings. To provide a right to postconviction relief without the assistance of counsel in a death case would be tantamount to providing no right at all.
By formally recognizing our actual practice, we will not only help insure the quality of the initial postconviction action but also speed up the resolution of capital proceedings. The assurance of counsel should serve not only to prevent miscarriages of justice, but also to facilitate completion of the postconviction process without undue delay. Like the legislature, this Court is concerned with the delays that have plagued capital collateral proceedings. Our desire is to make postconviction proceedings work well and without delay. However, for those goals to be met, it is essential that there be counsel. Not only does the integrity and complexity of the system require it, but this Court's ability to carry out our constitutional obligations depends substantially upon the quality of the work of capital counsel.
KOGAN, Senior Justice, concurs.
NOTES
[1] See Article I, section 16 (right to counsel), Article I, section 9 (due process), Article I, section 2 (equal protection), Article I, section 13 (habeas corpus) and Article I, section 17 (cruel and unusual punishment) of the Declaration of Rights of the Florida Constitution. The petitioners urge us to follow the rule we announced in Traylor v. State, 596 So.2d 957 (Fla.1992), of giving primacy to provisions of the Florida Constitution, rather than the U.S. Constitution, in resolving issues as to fundamental rights.
[2] In establishing CCR and the CCRCs, the legislature recognized that lawyers are necessary to ensure effective presentation of capital postconviction challenges, and "also to avoid the attendant problems of determining the need to appoint counsel and the utilization of volunteer counsel, including the resulting delays in the process." Spalding v. Dugger, 526 So.2d 71, 72 (Fla.1988).
[3] For example, a special committee appointed by Chief Justice Shaw to study this issue in 1991 concluded:

RECOMMENDATION I. Specified named counsel should be designated to represent each defendant whose death sentence has been affirmed not later than 30 days after the mandate has issued from the Supreme Court of Florida or certiorari is denied by the United States Supreme Court, whichever is later. The capital collateral representative is, by law, responsible for representing these defendants. This committee recognizes that the capital collateral representative needs additional staff and funds in order to handle his current caseload. However, because of the level of funding presently available and the number of death penalty cases presently pending in the courts, it is not possible for that office to represent all of these defendants in a timely manner. The committee therefore recommends that The Florida Bar and the Volunteer Lawyer's Resource Center of Florida, Inc., assist in obtaining pro bono counsel to take ten new death penalty cases within the next year. With this assistance, the capital collateral representative will have some temporary relief, which should enable him to timely represent defendants, but this temporary assistance will not eliminate the need for adequate funding to assure proper and timely representation of all death penalty defendants. The committee acknowledges that additional pro bono counsel may still be required in the future, particularly for cases where conflicts exist concerning representation by the capital collateral representative.
See Report of the Supreme Court Committee on Postconviction Relief in Capital Cases, May 31, 1991.
[4] See Resolution Approved by the American Bar Association ("ABA") House of Delegates, February 3, 1997 (Exhibit "A") (calling upon each jurisdiction that imposes capital punishment not to carry out the death penalty until the jurisdiction implements policies and procedures that are consistent with long standing ABA policies, including the provision of competent counsel who are "provided with the time and funding necessary for proper investigations, expert witnesses and other support services."). Petitioners' counsel, Holland & Knight, has retained at its own expense The Spangenberg Group, a national expert in analysis of indigent defense systems, to develop a caseload methodology and prepare a report based on actual data gathered from CCRC-North and CCRC-South. Petitioners' claim that the report shows that the CCRCs are woefully underfunded but when properly funded and staffed by qualified lawyers, the CCRCs are the most cost-effective and efficient method of providing competent capital postconviction representation.
[5] Petitioners cite Justice Wells' dissenting opinion in an earlier case:

I do not accept the position that this Court has no immediate role in solving the postconviction representation problem or that our involvement would constitute "micromanaging" the three CCRC agencies. I believe that we not only have a role in postconviction proceedings but that at present we have no more important or immediate responsibility. Not dealing with the representation issue is a prescription for capital postconviction cases to continue as in the past and for them to drag on for another twenty years.
Amendments to Florida Rules of Criminal ProcedureCapital Postconviction Public Records Production (Time Tolling), 708 So.2d 913, 915 (Fla.1998) (Wells, J., dissenting).
[6] We are not alone in this regard. As noted in a recent opinion of the Georgia Supreme Court, only Wyoming and Georgia have failed to provide counsel:

In determining the requirements of "fundamental fairness," another relevant inquiry is the contemporary practice. The federal government and all states but two provide a right to counsel in capital postconviction proceedings. Georgia and Wyoming are the only two jurisdictions that fail to provide a right to counsel in capital postconviction cases.
Gibson v. Turpin, 270 Ga. 855, 513 S.E.2d 186, 198 (Ga.1999) (Fletcher, J., dissenting) (footnotes omitted).
[7] Petitioners acknowledge the U.S. Supreme Court declined to formally recognize a right to postconviction counsel in Murray v. Giarratano, 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989); and this Court declined to find an absolute constitutional right to postconviction counsel in Graham v. State, 372 So.2d 1363, 1366 (Fla.1979). At the time, the Court noted that "simple procedures to seek postconviction relief" were available to the twelve persons then on death row, all of whom had volunteer counsel. Graham, 372 So.2d at 1366-1367. Today, of course, there are almost four hundred persons on death row.

As to Giarratano, three justices of the Georgia Supreme Court have recently noted:
[R]eliance on Murray v. Giarratano and State v. Davis is unpersuasive because neither case involved a death penalty inmate who was forced to proceed at his first habeas proceeding without counsel. Giarratano was not a habeas proceeding, but was a civil rights case seeking broad prospective relief. As Justice Kennedy observed in casting the deciding vote in Giarratano, Virginia already provided institutional lawyers to assist in preparing postconviction petitions and "no prisoner on death row in Virginia has been unable to obtain counsel to represent him in post conviction proceedings."
Gibson v. Turpin, 513 S.E.2d at 196 (Fletcher, J., dissenting) (footnotes omitted).
[8] See supra note 6.
[9] In addition to the due process provisions of Florida's Constitution, the right to postconviction counsel also clearly implicates article I, section 13 of the Florida Constitution, which guarantees that the right to relief through the writ of habeas corpus must be "grantable of right, freely and without cost." Florida Rule of Criminal Procedure 3.850 is the "procedural vehicle" for the collateral remedy available through the writ of habeas corpus. State v. Bolyea, 520 So.2d 562, 563 (Fla.1988). Courts addressing rule 3.850 issues "must be mindful that the right to habeas relief protected by article I, section 13 of the Florida Constitution is implicated." Haag v. State, 591 So.2d 614, 616 (Fla.1992).
[10] This Court has also recognized that "since the state of Florida enforces the death penalty, its primary obligation is to ensure that indigents are provided competent, effective counsel in capital cases," White v. Board of County Comm'rs, 537 So.2d 1376, 1379 (Fla. 1989), and that "all capital cases by their very nature can be considered extraordinary and unusual." Id. at 1378. This Court has recognized the crucial role of counsel at all levels of capital proceedings:

However, the basic requirement of due process in our adversarial legal system is that a defendant be represented in court, at every level, by an advocate who represents his client zealously within the bounds of the law. Every attorney in Florida has taken an oath to do so and we will not lightly forgive a breach of this professional duty in any case; in a case involving the death penalty it is the very foundation of justice.
Wilson v. Wainwright, 474 So.2d 1162, 1164 (Fla.1985).
[11] The United States Supreme Court has stated repeatedly that the Eighth Amendment requires a heightened degree of reliability in capital cases:

[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.
Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).
[12] This special degree of reliability is necessary to ensure that capital punishment is not imposed in an arbitrary and capricious matter, Gregg v. Georgia, 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and that no one who is innocent or who has been unconstitutionally convicted or sentenced to death is executed.