PER CURIAM.
This is an interlocutory appeal of an order entered by the trial court during capital postconviction proceedings. Pursuant to our decision in Trepal v. State, 754 So.2d 702 (Fla.2000), we have jurisdiction based on article V, section 3(b)(1) of the Florida Constitution to review interlocutory orders in capital collateral postconviction proceedings.
In Trepal, we adopted a two-prong test for determining whether to grant relief of interlocutory orders in death cases: (1) whether the trial court’s order conformed to the essential requirements of law; and (2) whether the order would cause an injury that could not adequately be corrected on appeal from the final order. 754 So.2d at 707. Because the Florida Department of Corrections (“DOC”) has no other adequate remedy and would suffer irreparable harm if the trial court exceeded its authority in this case, we must determine whether the order conformed to the essential requirements of law. See id.; see also Carter v. State, 706 So.2d 873, 874 (Fla. *227 1997) (granting review of a defendant’s challenge to an interlocutory order entered during postconviction proceedings); cf. State Dep’t of Children & Families v. Morrison, 727 So.2d 404 (Fla. 3d DCA 1999).
The trial court in this case found appel-lee Tony Randall Watts to be incompetent to proceed with his collateral postconviction proceedings.[1] Subsequently, the trial court entered an order that Watts remain confined at Florida Department of Corrections’ Mental Health Institution at Florida State Hospital (“CMHI”) for further treatment. DOC appeals this order, asserting that the trial court exceeded its authority by specifying where Watts should be confined and treated.
The issue in the case is whether a trial court, which previously determined that a capital defendant was incompetent to proceed during capital collateral proceedings, has the authority under this Court’s decision in Carter and the applicable Florida Rules of Criminal Procedure, to order that the defendant remain at a particular mental health hospital controlled by the DOC, when the purpose of that order is to restore the defendant to competency so that he or she can seek postconviction relief.
We conclude that under the narrow circumstances presented in this case, the trial court’s order conformed to the essential requirements of law. The trial court did not exceed its authority set forth in the applicable rules to enter orders that are directed to the goal of restoring the defendant’s competency in capital collateral postconviction proceedings.
BACKGROUND
Watts was convicted of first-degree murder, armed burglary with an assault, armed robbery, and sexual battery using physical force, and was sentenced to death on September 15, 1989. This Court affirmed the convictions and death sentence in Watts v. State, 593 So.2d 198 (Fla.1992).
In 1999, capital collateral counsel filed a motion on behalf of Watts to determine whether he was competent to assist in the capital postconviction process pursuant to our decision in Carter, 706 So.2d at 876, which held that in considering the issue of competency to proceed in postconviction proceedings, courts should follow the basic procedures set forth in Florida Rules of Criminal Procedure 3.210 through 3.212.[2] The trial court appointed experts to evaluate Watts’ competency, and the experts concluded that Watts was incompetent due to active psychosis and mental retardation. Accordingly, on May 4, 1999, the trial court entered an order determining that Watts was not competent to proceed and unable to assist collateral counsel. In addition, the trial court ordered that Watts be transferred and committed to CMHI.[3] The trial court found that Watts satisfied the criteria for involuntary hospitalization as set forth in section 916.12, Florida Statutes (1999),[4] and section 394.467(1), Florida *228 Statutes (1999),[5] also known as “The Baker Act.” The court instructed the administrator of CMHI to advise the court when Watts was restored to competency or no longer qualified for involuntary commitment. The trial court retained jurisdiction over the matter and further ordered that Watts “shall not be discharged or released from involuntary hospitalization without further Order of this Court.”
On July 19, 1999, DOC filed a motion to terminate the involuntary hospitalization of Watts and return him to the death row facility at Union Correctional Institution. At a subsequent hearing on the motion, DOC stated that although it was unable to make a determination as to whether Watts was competent to proceed, physicians at CMHI had reported that Watts was no longer in need of involuntary hospitalization as he was not a threat to himself or others. Moreover, DOC urged the court to send Watts back to death row, arguing that DOC had absolute discretion in determining where to house inmates in its custody.
In response, counsel for Watts argued against his return to death row. Counsel reminded the trial court that Watts was sent to CMHI to ensure compliance with the prescribed medication regimen. In addition, counsel argued that if DOC was allowed to return Watts to the Union Correctional Institution, Watts would not receive the proper treatment to restore him to competency.
During this hearing, the trial court also heard argument from the Assistant Attorney General, who argued in favor of Watts’ position that he continue to be housed and treated at CMHI. The Assistant Attorney *229 General agreed with Watts’ counsel that death row was “not the setting the doctors are contemplating that [Watts] can function in” and argued that CMHI was the place to restore him to competency.[6]
After hearing the parties’ arguments, the trial court stated that it could not change its previous order committing Watts to CMHI “without hearing testimony in an adversarial proceeding from expert witnesses about [Watts’] competency.” However, DOC presented no such testimony and the trial court subsequently denied DOC’s motion to terminate the involuntary hospitalization of Watts and to return him to death row at the Union Correctional Institution.
On January 3, 2000, DOC filed a motion for an amended order authorizing that DOC be permitted to transfer Watts to another facility for outpatient treatment. On January 7, 2000, the trial court conducted another hearing regarding DOC’s request to transfer Watts back to death row. Doctor Bruce Welch, a psychiatrist at CMHI, testified at the hearing and stated that Watts was diagnosed as suffering from schizophrenia and paranoia. Doctor Welch stated that CMHI is the only mental hospital for inmates within the DOC and that it was designed to treat the most severe mental health cases and patients that require involuntary medication. Doctor Welch opined that Watts did not meet the criteria for treatment at CMHI and that he did not require treatment in a hospital setting. Rather, according to Dr. Welch, Watts was better suited for a transitional care facility, such as the facility at the Union Correctional Institution.
Moreover, Dr. Welch acknowledged that Watts had a history of not taking his medication while on death row and Dr. Welch stated that he could not predict whether Watts would continue to take his medication in a different setting or facility. Doctor Welch also acknowledged that Watts recently had refused to take his medication at CMHI, reported hearing voices, believed one of the security guards was Jesus, and reported a number of hallucinatory events and delusional ideas. However, because in a recent interview with Dr. Welch, Watts had denied experiencing such phenomena, Dr. Welch concluded that Watts should be discharged and sent back to death row.
Although DOC’s counsel stated that DOC had no statutory obligation to restore capital inmates in its custody to competency and that DOC generally treats mentally ill inmates to make them “compliant” and “capable of living in a general prison setting,” Dr. Welch testified that Watts was being treated to the best of DOC’s ability and that the current treatment plan “by happenstance ... would restore him to competency.” The court thereafter denied DOC’s motion and issued a written order on April 18, 2000, which provided that Watts would continue to reside and be treated at CMHI “until such a time as the Department of Corrections can show the Court that the Defendant is voluntarily taking his medication, is stable and can be returned to UCI.” This appeal followed.'
CARTER AND THE RULES OF CRIMINAL PROCEDURE
Watts contends that reading Carter and the Florida Rules of Criminal Procedure together, it is apparent that the trial court had the authority to order that Watts continue to be treated at CMHI to restore his competency. DOC, however, asserts that by issuing an order directing that Watts remain at CMHI, the trial court violated separation of powers principles because the authority to determine where to house *230 and treat inmates is an executive decision that only DOC can make. Thus, the issue in this case is whether the trial court exceeded its authority in entering the order directing that Watts remain at CMHI for further treatment.
In Carter, the Court addressed whether a capital inmate was entitled to a competency determination during postconviction proceedings. 706 So.2d at 874. We held that
a judicial determination of competency is required when there are reasonable grounds to believe that a capital defendant is incompetent to proceed in post-conviction proceedings in which factual matters are at issue, the development or resolution of which require the defendant’s input. • There can be no question that a capital defendant’s competency is crucial to a proper determination of a collateral claim when the defendant has information necessary to the development or resolution of that claim. Unless a death-row inmate is able to assist counsel by relaying such information, the right to collateral counsel, as well as the postconviction proceedings themselves, would be practically meaningless.
Id. at 875.
The Court recognized in Carter that no Florida Rule of Criminal Procedure governed competency proceedings during cap-iteil collateral proceedings. See id. at 876. However, the Court held that “[u]ntil such time as the Florida Rules of Criminal Procedure are amended to specifically address competency during capital collateral proceedings, the rules for raising and determining competency at trial should be looked to. See Fla. R.Crim. P. 3.210-3.212.” Carter, 706 So.2d at 876 (footnote omitted).[7]
Although the Court in CaHer provided trial courts with instructions to follow when a capital defendant is believed to be incompetent for purposes of postconviction proceedings, the opinion in CaHer did not discuss trial courts’ authority to order that incompetent death row inmates be committed to particular mental health facilities for proper treatment to restore competency. Nevertheless, we made it clear that the procedures were adopted “in the hope of ensuring the consideration of all viable collateral claims a death-row inmate may have, thereby fuHhering society’s interest in the proper imposition of the death sentence while at the same time promoting the timely commencement and resolution of postconviction proceedings." Id. at 876-77 (emphasis supplied).
Because at the time of the hearing in this case the rules had not been amended to specifically address competency during capital collateral proceedings, the trial court properly looked to rule 3.212(c),[8] as *231 we directed in Carter. See Carter, 706 So.2d at 876. Rule 3.212(c)(2) provides in pertinent part that “[i]f the defendant is incarcerated, the court may order treatment to be administered at the custodial facility or may order the defendant transferred to another facility for treatment.” (Emphasis supplied.)
During the pendency of this appeal, rule 3.851 was amended in accordance with our directive in Carter.[9] Although not in effect at the time of the proceedings in this case, rule 3.851(d)(13) now explicitly provides that after the trial court has found an inmate to be incompetent to proceed, the court must follow the procedures outlined in rule 3.212(c). Chapter 916 is the applicable statute that sets forth the criteria for commitment. Rule 3.851(d)(13) also provides that if an inmate requires treatment for his or her incompetency, such treatment, “to the extent practicable ... shall take place at a custodial facility under the direct supervision” of the DOC. Fla. R.Crim. P. 3.851(d)(13).
ANALYSIS
We acknowledge the general proposition advanced by DOC that ordinarily the decision as to where to house an inmate is a decision outside of the authority of the trial court and properly within the authority of DOC. Cf. Morrison, 727 So.2d at 405; Singletary v. Acosta, 659 So.2d 449, 450 (Fla. 3d DCA 1995). However, having reviewed all of the statutes cited by DOC, specifically chapter 944[10] and chapter 945,[11] we are convinced that these stat *232 utes do not address the unique circumstance of restoring a capital defendant to competency in order to enable a postcon-viction motion to proceed. In fact, by their very terms, these statutes are inapplicable to the manner in which a trial court would address continued placement of a capital defendant who has been found incompetent to proceed with postconviction proceedings.[12]
In the absence of a contrary statutory directive to DOC and in light of the affirmative responsibility placed on trial courts and this Court with respect to the death penalty, we conclude that the trial court in this case acted properly in following the dictates of the existing rules of criminal procedure and in directing that Watts remain at CMHI, where he could continue to receive the necessary treatment aimed at restoring him to competency in order to allow the postconviction process to proceed.
As we have acknowledged, “[W]e have a constitutional responsibility to ensure the death penalty is administered in a fair, consistent and reliable manner, as *233 well as having an administrative responsibility to work to minimize the delays inherent in the postconviction process.” Arvelaez v. Butterworth, 738 So.2d 326, 326-27 (Fla.1999). Further, as Chief Justice Wells stated in a concurring opinion in Allen v. Butterworth, 756 So.2d 52, 68 (Fla.2000):
The procedures of postconviction in capital cases must be focused so that the defendant who should not be on death row is removed from that condition at as early a time as possible. That is the legitimate goal of postconviction proceedings and the abiding reason that we must continue our efforts in removing unwarranted delay from the processing of these cases.
The very purpose of Garter was to set forth procedures that would ensure the “consideration of all viable collateral claims a death-row inmate may have,” which in turn would further “society’s interest in the proper imposition of the death sentence while at the same time promoting the timely commencement and resolution of postconviction proceedings.” Carter, 706 So.2d at 876-77. Yet, in this case, the postconviction proceedings cannot commence, and most certainly cannot be resolved, until Watts is restored to competency.
Thus, it is in the interest of not only the defendant, but also the victim’s family, the State, this Court, and society that a capital defendant found to be incompetent in post-conviction proceedings be treated in a manner to restore the defendant to competency as soon as possible. As noted above, although the DOC asserts that the trial court exceeded its authority, the Attorney General on behalf of the State has not challenged the propriety of the trial court’s order. In fact, at the hearing below, the Assistant Attorney General argued that Watts should remain at CMHI because this facility was the best place to restore him to competency.
The trial court’s order in this case was aimed at restoring the defendant to competence in a timely and efficient manner so that the court could proceed with the resolution of the postconviction proceedings. The trial court’s order is in conformity with the rules of criminal procedure regarding commitment of a defendant for treatment for restoration of competency and with chapter 916 governing mentally ill defendants.[13] We note that in this appeal, DOC does not challenge the constitutionality of Florida Rules of Criminal Procedure 3.210 through 3.212 or rule 3.851(d)(13).
This case does not involve an issue as to which mental health hospital Watts should be transferred. CMHI is the only mental health hospital available to inmates within the DOC and CMHI is specifically recognized as a forensic facility under section 916.106(8). The trial court’s order contemplated that Watts be returned to Union Correctional Institution, the facility selected by DOC, once “the Department of Corrections can show the Court that [Watts] is voluntarily taking his medication, is stable and can be returned to UCI.” Thus, we hold that the trial court has not usurped *234 DOC’s general authority of where to house inmates.
Therefore, we conclude that the trial court did not act outside of its authority and, accordingly, we affirm the order under review.
It is so ordered.
WELLS, C.J., and SHAW, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ„ concur.
HARDING, J., dissents with an opinion.

. The trial court's order finding Watts incompetent to proceed was not appealed.

. Although on direct appeal Watts raised an issue as to his competency, this Court held that the trial court did not abuse its discretion in determining that Watts was competent to proceed. See Watts, 593 So.2d at 202.

. The CMHI facility subsequently was moved to Zephyrhills, Florida, and the trial court authorized that Watts be transferred to the facility's new location.

.Chapter 916, entitled "Mentally Deficient and Mentally, Ill Defendants,” sets forth specific procedures for defendants found incompetent to proceed due to their mental illness. To be found mentally incompetent, the defendant must satisfy the criteria set forth in section 916.12, entitled "Mental competence to proceed,” which provides in pertinent part:
*228 (1) A defendant is incompetent to proceed within the meaning of this chapter if the defendant does not have sufficient present ability to consult with her or his lawyer with a reasonable degree of rational understanding or if the defendant has no rational, as well as factual, understanding of the proceedings against her or him.
(2) The experts shall first determine whether the person is mentally ill and, if so, consider the factors related to the issue of whether the defendant meets the criteria for competence to proceed; that is, whether the defendant has sufficient present ability to consult with counsel with a reasonable degree of rational understanding and whether the defendant has a rational, as well as factual, understanding of the pending proceedings.

. Part I of chapter 394, Florida Statutes (1999), entitled "Florida Mental Health Act,” authorizes courts to place individuals in the custody of the Department of Children and Family Services for involuntary treatment for their mental illness when the mental illness causes a likelihood of harm if left untreated. Section 394.467, entitled "Involuntary placement,” provides in pertinent part:
(1) Criteria. — A person may be involuntarily placed for treatment upon a finding of the court by clear and convincing evidence that:
(a) He or she is mentally ill and because of his or her mental illness:
1. a. He or she has refused voluntary placement for treatment after sufficient and conscientious explanation and disclosure of the purpose of placement for treatment; or
b. He or she is unable to determine for himself or herself whether placement is necessary; and
2. a. He or she is manifestly incapable of surviving alone or with the help of willing and responsible family or friends, including available alternative services, and, without treatment, is likely to suffer from neglect or refuse to care for himself or herself, and such neglect or refusal poses a real and present threat of substantial harm to his or her well-being; or
b. There is substantial likelihood that in the near future he or she will inflict serious bodily harm on himself or herself or another person, as evidenced by recent behavior causing, attempting, or threatening such harm; and
(b) All available less restrictive treatment alternatives which would offer an opportunity for improvement of his or her condition have been judged to be inappropriate.

. The Attorney General has not filed a brief or otherwise taken a position in this appeal.

. In Carter, we asked the Florida Criminal Procedure Rules Committee to propose rules in accordance with our opinion. 706 So.2d at 876 n. 3.

. Rule 3.212(c), entitled "Commitment on Finding of Incompetence," provides in pertinent part:
If the court finds the defendant is incompetent to proceed, or that the defendant is competent to proceed but that the defendant's competence depends on the continuation of appropriate treatment for a mental illness or mental retardation, the court shall consider issues relating to treatment necessary to restore or maintain the defendant’s competence to proceed.
(1) The court may order the defendant to undergo treatment if the court finds that the defendant is mentally ill or mentally retarded and is in need of treatment and that treatment appropriate for the defendant’s condition is available. If the court finds that the defendant may be treated in the community on bail or other release conditions, the court may make acceptance of reasonable medical treatment a condition of continuing bail or other release conditions.
*231 (2) If the defendant is incarcerated, the court may order treatment to be administered at the custodial facility or may order the defendant transferred to another facility for treatment or may commit the defendant as provided in subdivision (3).
(3) A defendant may be committed for treatment to restore a defendant’s competence to proceed if the court finds that:
(A) the defendant meets the criteria for commitment as set forth by statute;
(B) there is a substantial probability that the mental illness or mental retardation causing the defendant’s incompetence will respond to treatment and that the defendant will regain competency to proceed in the reasonably foreseeable future;
(C) treatment appropriate for restoration of the defendant’s competence to proceed is available; and
(D) no appropriate treatment alternative less restrictive than that involving commitment is available.
(Emphasis supplied.)

.This Court recently adopted the proposed amendments in Amendments to the Florida Rules of Criminal Procedure, 794 So.2d 457 (Fla.2000). The amendments to rule 3.851, entitled “Collateral Relief After Death Sentence Has Been Imposed and Affirmed on Direct Appeal,” became effective on January 1, 2001.

. Chapter 944, Florida Statutes (1999), entitled “State Correctional System,” is also known as "The Florida Corrections Code of 1957.” Section 944.17, Florida Statutes (1999), entitled "Commitments and classification; transfers,” provides in pertinent part:
(1) Each prisoner sentenced to the state penitentiary shall be committed by the court to the custody of the department.
(2) Each prisoner committed to the custody of the department shall be conveyed to such institution, facility, or program in the correctional system as the department shall direct, in accordance with its classification scheme.
[[Image here]]
(7) Pursuant to such regulations as it may provide, the department may transfer prisoners from one institution to another institution in the correctional system and classify and reclassify prisoners as circumstances may require.
(Emphasis supplied.)

. Chapter 945, Florida Statutes (1999), defines and explains the responsibilities of the Department of Corrections. Section 945.43(1), Florida Statutes (1999), entitled “Admission of inmate to mental health treatment facility,” provides that "[a]n inmate may be admitted to a mental health treatment facility if he or she is mentally ill and is in need of care and treatment.” (Emphasis supplied.) *232 As defined by section 945.42(8), Florida Statutes (1999), “mentally ill,” means
an impairment of the emotional processes, of the ability to exercise conscious control of one's actions, or of the ability to perceive reality or to understand, which impairment substantially interferes with a person's ability to meet the ordinary demands of living, regardless of etiology, except that, for the purposes of transfer of an inmate to a mental health treatment facility, the term does not include retardation or developmental disability as defined in chapter 393, simple intoxication, or conditions manifested only by antisocial behavior or drug addiction.
The phrase “In need of care and treatment” is defined as follows: "[A]n inmate has a mental illness for which inpatient services in a mental health treatment facility are necessary, which mental illness poses a real and present threat of substantial harm to the inmate’s well-being or to the safety of others.” § 945.42(5), Fla. Stat.
Section 945.43 also provides procedures for the admission of mentally ill inmates to CMHI:
(2) Admission to a mental health treatment facility.—
(a)An inmate may be admitted to a mental health treatment facility after notice and hearing, upon the recommendation of the superintendent of the facility where the inmate is confined and of the director. The recommendation shall be entered on a certificate and must be supported by the expert opinion of a psychiatrist and the second opinion of a psychiatrist or psychologist. The certificate shall be filed with the court in the county where the inmate is located and shall serve as a petition for a hearing regarding placement.
(b) A copy of the certificate shall also be filed with the department, and copies shall be served on the inmate and the inmate’s representatives....
(c) The petition may be filed in the county in which the inmate is being treated at any time within 6 months of the date of the certificate. The hearing shall be held in the same county, and one of the inmate’s physicians at the facility shall appear as a witness at the hearing. If the court finds that the inmate is mentally ill and in need of care and treatment, it shall order that he or she be admitted to a mental health treatment facility or, if the inmate is at a mental health treatment facility, that he or she be retained there. However, the inmate may be immediately transferred to and admitted at a mental health treatment facility by executing a waiver of the hearing by express and informed consent, without awaiting the court order. The court shall authorize the mental health treatment facility to retain the inmate for up to 6 months. If, at the end of that time, continued treatment is necessary, the superintendent shall apply to the court for an order authorizing continued placement.

. For example, section 945.45, Florida Statutes (1999), entitled "Procedure for continued placement of inmates,” sets forth the procedures DOC must follow to continue to treat an inmate in a mental health treatment facility and contemplates that an administrative law judge will determine whether continuing treatment is appropriate.

. We distinguish Acosta, 659 So.2d at 450, which dealt solely with the issue of treatment and placement of a sentenced defendant in the prison system and did not address the question of the scope of the trial court’s authority with regard to the issue of restoring a defendant to competency for purposes of post-conviction relief. We also distinguish Morrison, 727 So.2d at 405, which addressed a trial court’s placement of a noncapital defendant, who was found to be incompetent to proceed pretrial, in a specific facility operated by the Department of Children and Families. In contrast to this case, Morrison involved circumstances that explicitly were covered by chapter 916 of Florida Statutes.